Michelle **FLESHNER**, Respondent,

v.

**PEPOSE VISION INSTITUTE, P.C.**, Appellant.

**No. SC 90032.**

Supreme Court of Missouri,
En Banc.

Feb. 9, 2010.

Robert A. Kaiser, Thomas B. Weaver, Jeffery T. McPherson, Armstrong Teasdale LLP, St. Louis, for Appellant.

Jerome J. Dobson, Michelle Dye Neumann, Jonathan C. Burns, Gregory A. Rich, Dobson, Goldberg, Berns & Rich, LLP, St. Louis, for Respondent.

J. Bennett Clark, Emma Harty, James M. Weiss, St. Louis, for Amicus Curiae Anti–Defamation League.

John D. Lynn, Sedey Harper, P.C., St. Louis, Marie L. Gockel, Bratcher Gockel & Kingston, L.C., Kansas City, for Amicus Curiae St. Louis and Kansas City Chapters of the National Employment Lawyers Association.

MARY R. RUSSELL, Judge.

Michelle Fleshner sued her former employer, Pepose Vision Institute, P.C. ("PVI"), for damages resulting from its wrongful termination of her. A jury found PVI liable on Fleshner's claim and awarded her $30,000 in actual damages and $95,000 in punitive damages. This Court granted transfer after disposition by the court of appeals. Jurisdiction is vested in this Court pursuant to article V, section 10 of the Missouri Constitution.

Among its allegations of error, PVI claims that the trial court erred in failing to hold a hearing on its motion for a new trial based on juror misconduct. PVI contends that one juror's anti-Semitic comments about a defense witness deprived it of a jury of 12 fair and impartial jurors. This Court finds that if a juror makes statements evincing ethnic or religious bias or prejudice during jury deliberations, the parties are deprived of their right to a fair and impartial jury and equal protection of the law. Accordingly, the trial court should have held a hearing to determine whether the alleged anti-Semitic comments were made. The overruling of the motion for a new trial was error. The judgment is reversed, and the case is remanded.

PVI also claims that the trial court erred in rejecting its proposed verdict director that would have instructed the jury that the proper causal standard in a wrongful discharge action based on the

public-policy exception was "exclusive causation." Instead, the trial court directed the jury that it should find for Fleshner if it believed she was fired "because" she spoke with a government investigator. This Court finds that the proper instruction for the causal standard is "contributing factor." In the future, trial courts should use a modified MAI 31.24, applying the "contributing factor" analysis, until a specific instruction for the public-policy exception is adopted. PVI, however, cannot show prejudice resulted from the instruction given.

## I. Background

Fleshner worked for PVI, a refractive surgery practice. During the course of her employment, the U.S. Department of Labor investigated PVI to determine whether it failed to pay its employees overtime compensation when they worked more than 40 hours a week. Fleshner received a telephone call at home from a Department of Labor investigator seeking background information about PVI. Fleshner told the investigator about the hours worked by PVI's employees. The next morning she reported her telephone conversation to her supervisor.

Fleshner's employment with PVI was terminated the day after she reported the telephone conversation. Fleshner filed an action against PVI, asserting wrongful termination of employment in violation of public policy and failure to pay overtime compensation in violation of section 290.505, RSMo Supp.2003.[1] As noted, the jury found in favor of Fleshner and awarded her $125,000.

PVI filed motions for a new trial on several bases, including juror misconduct.

After the jury was dismissed, a juror approached PVI's attorneys and reported that another juror made anti-Semitic statements during jury deliberations. According to the juror's affidavit, another juror made the following comments directed at a witness for PVI:[2] "She is a Jewish witch." "She is a Jewish bitch." "She is a penny-pinching Jew." "She was such a cheap Jew that she did not want to pay Plaintiff unemployment compensation."

According to an affidavit by one of PVI's attorneys, another juror approached PVI's attorneys and indicated that several anti-Semitic comments were made during deliberations but did not specify what was said. In overruling PVI's motions, the trial court concluded that jury deliberations are sacrosanct and that the juror's alleged comments did not constitute the kind of jury misconduct that would allow the trial court to set aside the verdict and order a new trial.

## II. Analysis

### A. Jury Misconduct in the Form of Anti–Semitic Remarks

PVI alleges that its right to a fair and impartial jury trial was denied when the trial court overruled its motions for a new trial because a juror allegedly made anti-Semitic comments about a witness during jury deliberations. PVI contended in its motions for new trial that, as a result of the anti-Semitic comments, it was deprived of its due process rights and did not receive a fair trial.

#### Standard of Review

 This Court will not disturb a trial court's ruling on a motion for a new trial

1. Fleshner voluntarily dismissed the failure to pay overtime count prior to trial and proceeded to trial only on the claim for wrongful termination.

2. The witness is the wife of the president and sole owner of PVI. She serves as PVI's corporate secretary and as a consultant to PVI.

based on juror misconduct unless the trial court abused its discretion. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001). A trial court abuses its discretion if its ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Wingate by Carlisle v. Lester E. CoxMed. Ctr.*, 853 S.W.2d 912, 917 (Mo. banc 1993).

### Analysis

■ Both the United States Constitution and Missouri Constitution provide that "no person shall be deprived of life, liberty or property without due process of law." U.S. CONST. amend. V; Mo. CONST. art. I, sec. 10. "It is axiomatic that 'a fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, —— U.S. ——, ——, 129 S.Ct. 2252, 2259, 173 L.Ed.2d 1208 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). Moreover, the Missouri Constitution provides for the right to a trial by jury for civil cases. Mo. CONST. art. I, sec. 22(a). As this Court has recognized, the right to a trial by jury does not simply provide that 12 jurors will decide the case. If the right to trial by jury is to mean anything, all 12 jurors must be "fair and impartial." *See Catlett v. Ill. Cent. Gulf R.R. Co.*, 793 S.W.2d 351, 353 (Mo. banc 1990); *Lee v. Balt. Hotel Co.*, 345 Mo. 458, 136 S.W.2d

695, 698 (1939). Each juror must "enter the jury box disinterested and with an open mind, free from bias or prejudice."[3] *Catlett*, 793 S.W.2d at 353 (internal quotation marks omitted). While every party is entitled to a fair trial, as a practical matter, our jury system cannot guarantee every party a *perfect* trial.

■ The general rule in Missouri, referred to as the Mansfield Rule, is that a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict. *Joy v. Morrison*, 254 S.W.3d 885, 889 (Mo. banc 2008). "A juror who has reached his conclusions on the basis of evidence presented for his consideration may not have his mental processes and innermost thoughts put on a slide for examination under the judicial microscope." *Baumle v. Smith*, 420 S.W.2d 341, 348 (Mo.1967). In other words, juror testimony is improper if it merely alleges that jurors acted on improper motives, reasoning, beliefs, or mental operations, also known as "matters inherent in the verdict."[4] *Neighbors v. Wolfson*, 926 S.W.2d 35, 37 (Mo.App.1996). There are two major policy considerations for this rule. First, there would be no end to litigation if verdicts could be set aside because one juror reportedly did not correctly understand the law or accurately weigh the evidence. *Baumle*, 420 S.W.2d at 348. Second, there is no legitimate way

---

**3.** Voir dire is the tool for trial courts to weed out those potential jurors who are not fair and impartial. *State v. Edwards*, 116 S.W.3d 511, 529 (Mo. banc 2003). Ideally, the potential jurors' answers to questioning during voir dire would reveal every bias or prejudice. Those potential jurors expressing biases or prejudices would be stricken, while those venirepersons who did not reveal any biases or prejudices would be impaneled to hear and decide the case. In reality, potential jurors are not likely to admit their biases or prejudices, especially those concerning ethnicity and religion, in open court proceedings like voir dire.

**4.** Matters inherent in the verdict include a juror not understanding the law as stated in the instructions, a juror not joining in the verdict, a juror voting a certain way due to misconception of the evidence, a juror misunderstanding the statements of a witness, and a juror being mistaken in his calculations. *Baumle*, 420 S.W.2d at 348.

to corroborate or refute the mental process of a particular juror. *Id.*

■ Over the years, an exception to the rule prohibiting juror testimony has been adopted. Jurors may testify about juror misconduct occurring outside the courtroom. *Travis v. Stone*, 66 S.W.3d 1, 4 (Mo. banc 2002). This exception has been used to allow jurors to testify as to whether they gathered evidence independent to that presented at trial. *See id.* at 3 (where juror visited accident scene during a trial recess); *Middleton v. Kansas City Pub. Serv. Co.*, 348 Mo. 107, 152 S.W.2d 154, 156 (1941) (where juror visited several used car dealerships measuring the type car involved in the accident). When a juror obtains extrinsic evidence, the trial court conducts a hearing to determine whether the extrinsic evidence prejudiced the verdict. *See Travis*, 66 S.W.3d at 4.

Here, PVI did not allege juror misconduct occurring outside the courtroom. Instead, PVI asked for a new trial on the basis of juror misconduct occurring *inside* the jury room. PVI alleges that comments made by a juror revealing religious and ethnic bias or prejudice during deliberations prevented it from receiving its constitutional right to a trial by a fair and impartial jury.

Specifically, PVI alleges that, during jury deliberations, a juror made the following statements about the defense witness, who is also the wife of the president of PVI: "She is a Jewish witch." "She is a Jewish bitch." "She is a penny-pinching Jew." "She was such a cheap Jew that she did not want to pay Plaintiff unemployment compensation." Those alleged comments, PVI claims, demonstrate it did not receive a trial by a fair and impartial jury.

■ While jurors' mental processes and innermost thoughts or beliefs may not be examined, *see Baumle*, 420 S.W.2d at 348, this Court has never considered whether the trial court may hear testimony about juror statements during deliberations evincing ethnic or religious bias or prejudice.

Other jurisdictions that have analyzed similar situations have decided that juror testimony is admissible. The Wisconsin Supreme Court in *After Hour Welding, Inc. v. Laneil Management Co.* determined a trial court may hear juror testimony if it learns that the verdict may have been a result of racial, national origin, religious, or gender bias. 108 Wis.2d 734, 324 N.W.2d 686, 690 (1982). In that case, the defendant moved for a new trial on the basis of jury misconduct. *Id.* at 688. The defendant supported its motion with a juror's affidavit stating that other jurors called a witness who was an officer of the defendant corporation "a cheap Jew." *Id.* In making its decision, the court recognized that "[w]hile the rule against impeachment of a jury verdict is strong and necessary, it is not written in stone nor is it a door incapable of being opened." *Id.* at 689. The rule "competes with the desire and duty of the judicial system to avoid injustice and to redress the grievances of private litigants." *Id.* The court balanced the interest of privacy for juror discussion against the right to a fair trial and found that when the right to a trial by an impartial jury is impaired by a juror's material prejudice, the interest of juror privacy yields to the right to a fair trial. *Id.* at 739–40, 324 N.W.2d 686.

Similarly, the Florida Supreme Court considered whether a trial court could hear juror testimony about racial remarks made in jury deliberations. *Powell v. Allstate Ins. Co.*, 652 So.2d 354, 355 (Fla.1995). The trial court held an in-court interview of a juror, who revealed that during deliberations several jurors made derogatory remarks about the plaintiffs, both of whom

were black citizens of Jamaican birth. *Id.* at 355 n. 2. The jury foreperson stated the following, considering it a "joke": "There's a saying in North Carolina, hit a [n\* \* \* \* \*] and get ten points, hit him when he's moving, get fifteen." *Id.* The court recognized that a juror may not testify as to "any matter which essentially inheres in the verdict or indictment." *Id.* at 356. However, jurors may testify about "overt acts" that might have prejudicially affected the jury's verdict. *Id.* The court concluded that "appeals to racial bias ... made openly among jurors" constitute "overt acts," and the trial court may hear juror testimony to impeach the verdict. *Id.* at 357; *see also Marshall v. State*, 854 So.2d 1235, 1240–41 (Fla.2003) (finding that racial jokes told during deliberations do not inhere in the verdict and remanding for evidentiary hearing); *Wright v. CTL Distrib., Inc.*, 650 So.2d 641, 642–43 (Fla. Dist.Ct.App.1995) (remanding for evidentiary hearing where juror stated that plaintiff was "a fat black woman on welfare"); *Sanchez v. Int'l Park Condo. Ass'n*, 563 So.2d 197, 198–99 (Fla.Dist.Ct.App. 1990) (remanding for new trial where juror made derogatory remarks about persons of Cuban descent).

In *Evans v. Galbraith–Foxworth Lumber Co.*, the Texas Court of Civil Appeals found that when jurors made anti-Semitic comments during jury deliberations, litigants did not receive a fair and impartial trial by jury. 31 S.W.2d 496, 500 (Tex.Civ. App.1929). During deliberations, a juror stated that one of the plaintiffs was "a Jew," that one of the jurors was "a Jew," but that he could not understand why other jurors would be "partial to a Jew." *Id.* at 499. The court explained that, in a situation where jurors make anti-Semitic comments during deliberations, setting aside the verdict is proper:

It may be clear that eleven (or a lesser number) of the jurors were not, to any degree, influenced by the improper conduct; yet if it remains reasonably doubtful whether one (or a larger number) was, or was not, influenced, the vice remains and the verdict must be set aside because each juror can rightly agree to the verdict only when guided solely by the instructions of the trial judge and the evidence heard in open court.

*Id.* at 500 (internal citations omitted).

When a juror makes statements evincing ethnic or religious bias or prejudice during deliberations, the juror exposes his mental processes and innermost thoughts. What used to "rest alone in the juror's breast" has now been exposed to the other jurors. *See Baumle*, 420 S.W.2d at 348. The juror has revealed that he is not fair and impartial. Whether the statements may have had a prejudicial effect on other jurors is not necessary to determine. Such statements evincing ethnic or religious bias or prejudice deny the parties their constitutional rights to a trial by 12 fair and impartial jurors and equal protection of the law. *See Powell*, 652 So.2d at 358. The Florida Supreme Court, in criticizing a juror's expression of racial bias, commented, "neither a wronged litigant nor society itself should be without a means to remedy a palpable miscarriage of justice." *Id.* at 356.

Accordingly, if a party files a motion for a new trial alleging there were statements reflecting ethnic or religious bias or prejudice made by a juror during deliberations, the trial court should hold an evidentiary hearing to determine whether any such statements occurred. Juror testimony about matters inherent in the verdict should be excluded. *See Baumle*, 420 S.W.2d at 348. If the trial court finds after conducting a hearing that such biased or prejudicial statements were made

during deliberations, then the motion for a new trial should be granted as the parties would have been deprived of their right to a trial by 12 fair and impartial jurors.

Jurors are encouraged to voice their common knowledge and beliefs during deliberations, but common knowledge and beliefs do not include ethnic or religious bias or prejudice. The alleged anti-Semitic comments made during deliberations in this case are "not simply a matter of 'political correctness' to be brushed aside by a thick-skinned judiciary." *Powell*, 652 So.2d at 358. As stated in *United States v. Heller*, "A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires." 785 F.2d 1524, 1527 (11th Cir. 1986). Such stereotyping has no place in jury deliberations.

The ethnicity or religion of any party or witness unrelated to the evidence should have no bearing on the outcome of a trial. To allow the verdict to stand without holding a hearing to determine whether the alleged comments were made undermines public confidence in the justice system. The courts must zealously guard the right to a fair and impartial trial and equal protection under the law.

The trial court abused its discretion in failing to hold an evidentiary hearing to determine whether the alleged juror misconduct occurred. The trial court's judgment is reversed, and the case is remanded.

### B. Standard for Causation of Termination

PVI also argues that the trial court improperly instructed the jury on the causal requirement for wrongful discharge under the public-policy exception. PVI claims that the trial court's failure to give its proffered instruction constitutes prejudicial error requiring reversal and remand for a new trial.

Both PVI and Fleshner proposed verdict directors with different causal standards. The trial court rejected PVI's proffered instruction, which would have directed the jury to find for Fleshner if it found that her communication with the investigator was the "exclusive cause" of her discharge.[5] Fleshner offered two verdict directors. The first instructed the jury that the communication with the investigator was a "contributing factor" to Fleshner's termination.[6] The trial court rejected the instruction. The second instructed the jury that Fleshner was fired "because" she communicated with the investigator.[7] The trial court gave this instruction.

The issue before this Court is how the jury should be instructed as to the appropriate causation standard when an at-will employee is discharged in violation of the public-policy exception.

### Standard of Review

Whether a jury is properly instructed is a matter of law subject to *de novo* review. *Edgerton v. Morrison*, 280 S.W.3d 62, 65 (Mo. banc 2009). To reverse a jury verdict on the ground of instruction-

---

5. PVI's proposed verdict director was patterned after MAI 23.13, the instruction for a retaliatory discharge based on filing a workers' compensation claim.

6. Fleshner's first proposed verdict director was patterned after MAI 31.24, the instruc-

tion for an employment discrimination action based on the Missouri Human Rights Act.

7. Fleshner's second proposed verdict director was a not-in-MAI instruction.

al error, the party challenging the instruction must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction. *Sorrell v. Norfolk S. Ry. Co.*, 249 S.W.3d 207, 209 (Mo. banc 2008).

## Analysis

 Fleshner was an at-will employee at PVI. Generally, at-will employees may be terminated for any reason or for no reason. *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 663 (Mo. banc 1988). As a matter of law, the discharged at-will employee has no cause of action for wrongful discharge. *Id.*

Since *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.App.1985), the court of appeals has recognized the public-policy exception to the at-will-employment rule. The *Boyle* court described the public-policy exception as "narrow" and articulated it as follows:

> [W]here an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

*Id.* at 871, 878. Further, the court explained that public policy "is the principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Id.* at 871.

This Court has never explicitly recognized the public-policy exception. *See Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985) (holding that the prima facie tort theory may not be used to circumvent the employment-at-will doctrine); *Johnson*, 745 S.W.2d at 663 (refusing to consider whether to create a public-policy exception to the employment-at-will doctrine because the employee did not implicate a constitutional provision, statute, or regulation based on a statute); *Johnson v. Kraft Gen. Foods, Inc.*, 885 S.W.2d 334, 335 n. 1 (Mo. banc 1994) (declining to rule on the propriety of a common law cause of action for wrongful discharge based on public policy articulated in the statute at issue because the employee did not argue it on appeal); *Luethans v. Washington Univ.*, 894 S.W.2d 169, 171 n. 2 (Mo. banc 1995) (determining that the Court has never expressly defined or adopted the public-policy exception but recognizing that it exists for the purpose of that opinion). While this Court has not found the need to reach the question of adopting or rejecting the public-policy exception for 25 years, the issue at hand necessarily requires this Court to determine the validity of the public-policy exception.[8]

---

**8.** In its amicus brief, the National Employment Lawyers Association argues that this Court recognized the public-policy exception to the employment-at-will doctrine in *Smith v. Arthur Baue Funeral Home*, 370 S.W.2d 249 (Mo.1963). In *Smith*, the discharged employee claimed that he was terminated because of his membership in a labor organization. *Id.* at 251–52. The employee argued that his former employer violated his right to organize and to bargain collectively under the Missouri Constitution. *Id.* at 252 (citing Mo CONST. art. I, sec. 29). This Court recognized that the employment-at-will doctrine was modified by the adoption of article I, section 29 so that if the employee was discharged because he exercised his constitutional right to collectively bargain, the employee may bring an action for damages. *Id.* at 254.

 Although the general rule in Missouri is that an at-will employee may be terminated for any reason or no reason, the at-will-employment doctrine is not static. It may be modified directly by or through public policy reflected in the constitution, a statute, a regulation promulgated pursuant to statute, or a rule created by a governmental body. *See Johnson,* 745 S.W.2d at 663. To find otherwise would allow employers to discharge employees, without consequence, for doing that which is beneficial to society. For this reason, this Court expressly adopts the following as the public-policy exception to the at-will employment doctrine: An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities. *See Porter v. Reardon Mach. Co.,* 962 S.W.2d 932, 936–37 (Mo. App.1998); *see also Boyle,* 700 S.W.2d at 878. If an employer terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception.

 What is not reflected in *Boyle,* though, is how the jury should be instructed as to the proper causal standard for the public-policy exception. There is no MAI for trial courts to follow. PVI argues that the trial court erred in instructing the jury

that it had to find that PVI terminated Fleshner "because she communicated with the United States Department of Labor." PVI claims that by the trial court instructing the jury with the "because" standard, it rejected precedent. PVI contends that the trial court should have used the "exclusive cause" standard, following prior decisions regarding wrongful termination for filing a workers' compensation claim.

PVI's proffered jury instruction was modeled after MAI 23.13, which directs jurors to find for the plaintiff if they believe "the exclusive cause of such discharge was the plaintiff's filing of the workers' compensation claim." That instruction's origin is found in *Hansome v. Northwestern Cooperage Co.,* 679 S.W.2d 273 (Mo. banc 1984). In *Hansome,* an employee brought a statutory[9] action for wrongful discharge as a result of exercising his rights under the Missouri workers' compensation act. *Id.* at 274. When identifying the elements to the statutory action, the causal requirement was described as "an exclusive causal relationship between plaintiff's actions and defendant's actions." *Id.* at 275. Nowhere in the workers' compensation laws does "exclusive causal" or "exclusive causation" language appear. Yet in *Crabtree v. Bugby,* the causal requirement once again was described as "an exclusive causal relationship."[10] 967 S.W.2d 66, 70 (Mo. banc 1998).

The court of appeals, following *Hansome* and *Crabtree,* applied the "exclusive causation" standard to wrongful discharge under the public-policy exception in *Lynch*

---

**9.** The statute that authorizes a suit for wrongful discharge as a result of exercising rights under the Missouri workers' compensation act has remained the same since 1973. *See* section 287.780. All statutory references are to RSMo 2000 and Supp. 2008 unless otherwise noted.

**10.** Judge White's dissent in *Crabtree* objects to the majority's and *Hansome's* pronouncement that the proper causal standard is "exclusive causation." *Crabtree,* 967 S.W.2d at 73–74 (White, J., dissenting). Judge White describes the exclusive causation standard as "plucked out of thin air" by *Hansome,* noting that none of the cases relied on by this Court or the statute used the word "exclusive." *Id.* at 74.

*v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147 (Mo.App.1995). In *Lynch,* the employee claimed that he was discharged for notifying his supervisor about irregularities in the company's products. *Id.* at 149–50. The court noted that the public-policy exception is narrow and cited the *Hansome* case as authority for its decision. *Id.* at 151–52. Since *Lynch,* several court of appeals decisions have reiterated that "exclusive causation" is the proper standard. *See, e.g., Faust v. Ryder Commercial Leasing & Servs.,* 954 S.W.2d 383, 391 (Mo.App.1997); *Bell v. Dynamite Foods,* 969 S.W.2d 847, 852 (Mo.App.1998); *Grimes v. City of Tarkio,* 246 S.W.3d 533, 536 (Mo.App.2008).

 As observed in *Brenneke v. Department of Missouri, Veterans of Foreign Wars,* there is a key distinction between workers' compensation retaliation cases and public-policy exception cases. 984 S.W.2d 134, 140 (Mo.App.1998). Workers' compensation cases arise under statute, while public-policy exception cases arise under the common law of torts. *Id.* An exclusive causation standard is inconsistent with the proximate cause standard typically employed in tort cases. While prior cases indicate that "exclusive causation" is the appropriate standard for cases asserting retaliation in the workers' compensation statutory context, "exclusive causation" is not the proper standard for wrongful discharge based on the public-policy exception. To the extent that *Lynch, Faust, Bell,* and *Grimes* used an "exclusive causation" standard in wrongful discharge under the public-policy exception cases, they are incorrect.

Further, public policy requires rejection of "exclusive causation" as the proper causal standard for the public-policy exception. Employees would be discouraged from reporting their employers' violations of the law or for refusing to violate the law if "exclusive causation" were the standard. An employee who reported violations of the law or who refused to violate the law could be terminated, without consequence, by the employer. Upon a lawsuit alleging wrongful termination in violation of public policy, the employer could assert that, while the employee's reporting or refusal played a part in the decision to terminate, the employee was also fired for another reason, such as reporting for work late or failing to follow the dress code. "Exclusive causation" would result in an exception that fails to accomplish its task of protecting employees who refuse to violate the law or public policy.

The majority of jurisdictions have not required proof of "exclusive causation" for wrongful discharge based on the public-policy exception. *See, e.g., Teachout v. Forest City Cmty. Sch. Dist.,* 584 N.W.2d 296, 301–02 (Iowa 1998) (determinative factor); *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 535 (Tenn.2002) (motivating factor); *Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 405 (Utah 1998) (substantial factor); *Cardwell v. Am. Linen Supply,* 843 P.2d 596, 600 (Wyo.1992) (significantly motivated).[11]

Fleshner presented two options for the causal standard: "because" or "contributing factor." The "because" standard, which was submitted to the jury, has authority. *Boyle* itself insinuates that the causal standard is "because." 700 S.W.2d

---

11. Perhaps seeing the weakness in its argument for an exclusive causation standard, PVI alternatively argues that this Court should adopt the but-for standard articulated in *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852 (Mo. banc 1993), and require trial courts to instruct the jury using the causal standard in MAI 19.01, "directly caused or directly contributed to cause." PVI did not preserve the issue for appeal by submitting it as a proposed jury instruction. *See* Rule 84.13(a).

at 878. *Boyle* simply articulates the public-policy exception, without stating how the jury should be instructed with respect to the causal requirement. Further, pattern jury instructions for federal retaliation causes of action use "because of" as the causal connection required. *See, e.g.,* 3C KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 172.24 (5th ed. 2001) (retaliation claim by employee who opposed a practice made unlawful by the Americans with Disabilities Act); *Id.* § 173.23 (retaliation claim by employee who opposed a practice made unlawful by the Age Discrimination Employment Act); *Id.* § 174.23 (retaliation claim by employee who opposed a practice made unlawful by the Equal Pay Act).

The "contributing factor" causation standard has been articulated in other recent employment discharge cases. In *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814 (Mo. banc 2007), a former police captain sued the department that terminated his employment, alleging that he was terminated on account of his age and perceived disability in violation of the Missouri Human Rights Act ("MHRA"). *Id.* at 817–18. This Court noted that before its 2003 decision holding that jury trials are available under the MHRA, the causation standard was whether the employment decision was "motivated by" an illegitimate purpose. *Id.* at 819. The adoption of MAI 31.24 in 2005 brought a new causal standard: whether the illegitimate purpose was a "contributing factor" in the employment decision. *Id.* at 820. *Daugherty* found that the "contributing factor" language used in MAI 31.24 is consistent with the plain meaning of the MHRA. *Id.; see also Hill v. Ford Motor*

*Co.,* 277 S.W.3d 659, 666 (Mo. banc 2009) (prevailing on a hostile work environment sexual harassment claim requires proof that gender was a "contributing factor" in the harassment).

Essentially, the MHRA modifies the at-will employment doctrine by instructing employers that they can terminate employees, but their reason for termination cannot be improper. The MHRA's employment provisions mandate that employees may not terminate employees on the basis of their race, color, religion, national origin, sex, ancestry, age, or disability. Section 213.055.1. The public-policy exception is the same: it modifies the at-will employment doctrine by mandating that employers may not terminate employees for reporting violations of law or for refusing to violate the law or public policy.

Likewise, cases involving both the MHRA and the public-policy exception turn on whether an illegal factor played a role in the decision to discharge the employee. The evidence in both types of cases directly relates to the employer's intent or motivation. The employer discharges the employee,[12] asserting a reason for the termination that may or may not be pretextual. Under the MHRA, if race, color, religion, national origin, sex, ancestry, age, or disability of the employee was a "contributing factor" to the discharge, then the employer has violated the MHRA. The employer's action is no less reprehensible because that factor was not the only reason. Similarly, if an employee reports violations of law or refuses to violate the law or public policy as described herein, it is a "contributing factor" to the discharge, and the discharge is still reprehensible

---

12. An employer can violate the MHRA by making an employment decision other than discharge. Section 213.055.1 ("To fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges....").

regardless of any other reasons of the employer.

 PVI does not argue that "because" is an easier standard than "contributing factor." Prejudice is required to reverse a jury verdict on the ground of instructional error. PVI cannot show prejudice resulted from the "because" verdict director. As used here, this Court cannot find error with the "because" instruction as it did not mislead, misdirect, or confuse the jury, nor did it prejudice the result. In the future, though, trial courts should use a modified MAI 31.24, applying the "contributing factor" analysis until this Court adopts a specific instruction for wrongful discharge based on the public-policy exception.

### C. Motions for Directed Verdict and for Judgment Notwithstanding the Verdict

PVI further claims that the trial court erred in overruling its motions for directed verdict and for judgment notwithstanding the verdict ("JNOV"). It argues that either a directed verdict or a JNOV was proper because Fleshner's public policy argument was preempted by the Fair Labor Standards Act ("FLSA"). In addition, PVI asserts that the trial court should have granted a directed verdict or a JNOV because Fleshner did not present substantial evidence to support her claim for wrongful termination under the public-policy exception.

### Standard of Review

 The standard of review for failures to sustain motions for directed verdict and for JNOV is essentially the same. *Hodges v. City of St. Louis*, 217 S.W.3d 278, 279 (Mo. banc 2007). This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences. *Id.* If the challenge is that an affirmative defense precludes recovery for the plaintiff, this Court must determine whether the moving party proved the affirmative defense as a matter of law. *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 348 (Mo.App.2009); *Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n*, 192 S.W.3d 461, 475 (Mo.App.2006). Neither a motion for directed verdict nor for JNOV should be granted unless there are no factual issues remaining for the jury to decide. *Damon Pursell*, 192 S.W.3d at 475.

### Fair Labor Standards Act Preemption

 PVI contends that Fleshner's claim for wrongful termination based on public policy is preempted by the FLSA. It argues that, as a matter of Missouri law, Fleshner may not bring the public policy claim because the FLSA provides an adequate remedy for her grievance, displacing the Missouri common law remedy. This Court has consistently held that "a statutory right of action shall not be deemed to supersede and displace remedies otherwise available at common law in the absence of language to that effect unless the statutory remedy fully comprehends and envelops the remedies provided by common law." *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 668 (Mo. banc 1999) (emphasis and internal quotation marks omitted). A statutory remedy does not "comprehend and envelop" the common law if the common law remedies provide different remedies from the statutory scheme. *Id.* For example, if the common law remedy provides punitive damages,

but the statutory scheme does not, then the common law scheme is not preempted. *See id.*

Punitive damages are available for wrongful discharge claims brought under the public-policy exception at common law. *See Kelly v. Bass Pro Outdoor World, LLC,* 245 S.W.3d 841, 849–51 (Mo.App. 2007). To preempt the public-policy exception, the FLSA must provide for punitive damages. This Court recognizes that there is a split of authority among the federal courts as to whether the FLSA provides punitive damages. *Compare Travis v. Gary Cmty. Mental Health Ctr.,* 921 F.2d 108, 111–12 (7th Cir.1990) (finding the FLSA provides for punitive damages), *with Snapp v. Unlimited Concepts, Inc.,* 208 F.3d 928, 934 (11th Cir.2000) (finding the FLSA does not provide for punitive damages). As the circuits are not in agreement and the United States Supreme Court has not resolved this contradiction, it is not certain that punitive damages are available. Until this issue is resolved by legislation or a court ruling, it cannot be assumed that the FLSA provides punitive damages, and it does not preempt recovery for wrongful termination under the public-policy exception.

*Public–Policy Violation*

■ PVI next asserts that Fleshner failed to make a submissible case because she did not present any evidence that she engaged in an activity protected by Missouri public policy. Because Fleshner spoke with a federal investigator rather than a state investigator, PVI claims that Missouri's minimum wage law, sections 290.500 to 290.530, is inapplicable to Fleshner. It argues that Fleshner cannot rely on the minimum wage law as the basis for her public policy claim because her activity was not protected by that law. PVI contends that the minimum wage law reflects the public policy of encouraging employees to speak with state, not federal, investigators without fear of being discharged. Essentially, PVI argues that to bring a wrongful discharge claim based on the public-policy exception, Fleshner must rely on a direct violation of a statute that retaliation against her violated.

The minimum wage law regulates the payment of overtime compensation. Section 290.505. The law also gives state officials the authority to investigate employers for their failure to pay overtime compensation. Section 290.510. Any employer who discharges an employee who has notified the appropriate state officials that the employer failed to pay overtime compensation, who has instituted proceedings against the employer seeking overtime compensation, or who has testified or will testify against the employer regarding overtime compensation is guilty of a class C misdemeanor. Section 290.525(7).

■ PVI's view of the reach of the public-policy exception is too narrow. Public policy is not to be determined by "the varying personal opinions and whims of judges or courts ... as to what they themselves believe to be the demands or interests of the public." *In re Rahn's Estate,* 316 Mo. 492, 291 S.W. 120, 123 (1926). Instead, public policy must be found in a constitutional provision, a statute, regulation promulgated pursuant to statute, or a rule created by a governmental body. *See Johnson,* 745 S.W.2d at 663. But as found in *Kirk v. Mercy Hospital Tri–County,* a plaintiff need not rely on an employer's *direct* violation of a statute or regulation. 851 S.W.2d 617, 621 (Mo.App.1993). Instead, the public policy must be *reflected by* a constitutional provision, statute, regulation promulgated pursuant to statute, or a rule created by a governmental body. *See id.* at 621–22.

 Moreover, there is no requirement that the violation that the employee reports affect the employee personally, nor that the law violated prohibit or penalize retaliation against those reporting its violation. *See, e.g., Porter*, 962 S.W.2d at 938–39 (recognizing that one can make a claim under the public-policy exception not just where the statute or regulation specifically prohibits retaliation but also in other cases where the employee reports a violation or refuses to violate a clear mandate of public policy as reflected in a statute or regulation).

 The public policy reflected by the minimum wage law is that employees should be encouraged to communicate with government labor investigators about their employers' overtime compensation without fear of retaliation. While a prosecution for violation of the law requires communication with *state* government labor investigators, a suit for wrongful termination is not so constrained. The public policy expressed by the statute covers communications made to federal or state officials or to the employee's superiors.[13] The disclosure here came well within these parameters. The trial court did not err in overruling

PVI's motions for directed verdict and JNOV on the ground that public policy reflected in the minimum wage law did not extend to communications with federal investigators.

## D. Admission of Evidence and Rejection of Limiting Instruction

 PVI next claims that the trial court erred in overruling its motion for a new trial in admitting evidence regarding PVI's enforcement of the non-competition agreement [14] and rejecting PVI's proposed limiting instruction on that evidence. PVI argues that the limiting instruction would have directed the jury not to consider the evidence about the non-competition agreement in determining whether PVI wrongfully discharged Fleshner.[15]

 A trial court's refusal to give an instruction is reviewed for abuse of discretion. *See Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 129–30 (Mo. banc 2007). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so

13. As noted in *Brenneke*, "under *Boyle* the whistleblower exception protects employees that appropriately report to superiors or other proper authorities." 984 S.W.2d at 139 (emphasis omitted). The public-policy exception explicitly recognizes that an employee's superiors can constitute the proper authority to whom to blow the whistle and that an employee who is fired for informing his superiors of wrongdoing by other employees is entitled to bring suit. *Faust*, 954 S.W.2d at 390–91; *see also Boyle*, 700 S.W.2d at 878; *Lynch*, 901 S.W.2d at 150–51 (stressing that a plaintiff need not report or threaten to report his concerns to outside authorities). *Porter* reaffirmed *Faust*'s recognition of internal whistleblowing. 962 S.W.2d 932. That case specifically held that a plaintiff's reports to his supervisor that wrongdoing occurred were adequate to meet the whistleblowing requirement. *Id.* at 937–38. There was no re-

quirement that the reports be made to outside, as opposed to internal, authorities. *Id.; accord Adolphsen v. Hallmark Cards, Inc.*, 907 S.W.2d 333 (Mo.App.1995) (invoking whistleblower exception when employee was fired after reporting to supervisor and CEO about violation of FAA regulations).

14. Because PVI failed to timely object to this evidence when it was offered at trial, the issue is not preserved for appeal. *See Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003).

15. At the time of her termination, Fleshner asked if PVI would release her from a non-competition agreement, but PVI declined. PVI filed a lawsuit seeking an injunction to prohibit Fleshner from working for a general ophthalmology practice. Eventually, Fleshner and PVI entered into a settlement agreement.

arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 130.

The trial court decided the jury could use the non-competition agreement and PVI's enforcement of it to show PVI's motivation in discharging Fleshner. The trial court's refusal to give PVI's proposed limiting instruction is not an abuse of discretion.

### III. Conclusion

The judgment is reversed, and the case is remanded.

All concur.