**Daniel R. DEFOE, Appellant,**

v.

**AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
Respondent.**

**WD 80069**

Missouri Court of Appeals,
Western District.

OPINION FILED: May 30, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied June
29, 2017

Kirk Holman and Kenneth D. Kinney; Kansas City, MO, Attorneys for Appellant.

Jeffrey D. Hanslick, Curtis R. Summers, and Robert J. Rojas, Kansas City, MO, Attorneys for Respondent.

Before Division Two: Thomas H. Newton, Presiding Judge, and James Edward Welsh and Karen King Mitchell, Judges

Karen King Mitchell, Judge

Daniel DeFoe appeals the dismissal, with prejudice, of his second amended petition against American Family Mutual Insurance Company (Employer), alleging wrongful termination. The court found that DeFoe's petition failed to state a claim under the public policy exception to Missouri's employment-at-will doctrine insofar as the facts pled failed to show a "well established and clearly mandated public policy" required for the application of the exception. Finding no error, we affirm.

## Background[1]

DeFoe worked as a Regional Legal Senior Staff Attorney in the Claims Legal Division of Employer's Kansas City office from July 14, 2003, to August 21, 2013. DeFoe was responsible for handling litigation involving Employer's insureds "within established corporate guidelines, applicable standards of good faith behavior, and the Missouri Rules of Professional Responsibility."

Beginning in 2009, DeFoe began to express concerns to his supervisor regarding increasing workloads and file retention. In 2010, Employer closed several offices and transferred their files to DeFoe's office, resulting in an increased workload for DeFoe and his colleagues. Another of Employer's offices was closed in July of 2012, and its files were also transferred to DeFoe's office. As a result of the closings, DeFoe's office was responsible for Employer's territory covering the western half of Missouri and the entire state of Kansas. Around the same time, DeFoe's division lost four attorneys and replaced only one. During 2012, DeFoe was assigned 85 litigation files, 73% of which were litigated in-

---

1. "We view the facts contained in the petition as true and in the light most favorable to the plaintiff." *Truman Med.Ctrs., Inc. v. McKay*, 505 S.W.3d 799, 801 (Mo. App. W.D. 2016).

house, while the remainder were assigned to outside counsel.

In 2012, DeFoe again expressed concerns to his supervisor about the increased workload and travel, as well as the decreased staffing and resources, suggesting they might have an effect on the competent representation of insureds. On several occasions in 2013 and before, DeFoe reported that "the number of cases to which he was assigned exceeded an amount which was reasonable and proper, and impacted the ability as an attorney to adequately represent the insureds' interests." On March 18, 2013, Employer gave DeFoe a Performance Improvement Plan—the first written form of discipline DeFoe had received during his employment. On August 21, 2013, DeFoe's employment was terminated.

On June 10, 2014, DeFoe commenced a lawsuit against Employer. On August 1, 2016, DeFoe filed a second amended petition, alleging wrongful termination in violation of public policy. DeFoe alleged that the Missouri Rules of Professional Responsibility, specifically Rules 4-1.1 and 4-5.4(c),[2] constituted "valid, clearly mandated source[s] of public policy, which serve[ ] to further public health, safety, and welfare." He further alleged that he engaged in protected activity in the following two ways:

1. "[B]y exercising professional judgment in the interests of his insureds by complaining about the increasing workloads imposed upon him by [Employer] which he believed compromised his ability to effectively and adequately represent his clients, i.e., insureds of [Employer], and therefore violated Rule 4-5.4(c) and Rule 4-1.1."

2. "[B]y acting in a manner encouraged by public policy by asserting his professional independence from that of [Employer] which continued to assign him an excessive amount of legal files in its effort to reduce its reliance on outside legal counsel to curtail costs."

He then alleged that Employer terminated his employment and that his protected activity was a contributing factor in the termination decision.

Employer filed a motion to dismiss, arguing that DeFoe's petition failed to state a claim insofar as Rules 4-1.1 and 4-5.4(c) could not support a claim for common law wrongful termination. After hearing arguments from both parties, the court granted Employer's motion, holding "that the provisions of the Missouri Rules of Professional Conduct upon which [DeFoe] relies in support of his claim—Rules 4-1.1 and 4-5.4(c)—are simply too vague in order to constitute the 'well established and clearly mandated public policy' required for the application of the exception to the facts as pled by [DeFoe]." DeFoe appeals.

### Standard of Review

"We review the trial court's grant of a motion to dismiss de novo." *Truman Med. Ctrs., Inc. v. McKay*, 505 S.W.3d 799, 801 (Mo. App. W.D. 2016). "We view the facts contained in the petition as true and in the light most favorable to the plaintiff." *Id.* "If the petition contains any facts that, if proven, would entitle the plaintiff to relief, then the petition states a claim." *Id.* "To state a claim, a petition must invoke substantive principles of law entitling the plaintiff to relief." *Id.* "We must affirm the trial court's ruling if the motion to dismiss could have been sustained on any of the grounds raised in

---

**2.** All rule references are to the Missouri Supreme Court Rules (2016).

the motion regardless of whether the trial court ruled on that ground." *Id.*

## Analysis

 DeFoe raises a single claim on appeal; he argues that the court erred in dismissing his second amended petition because Rules 4-1.1 and 4-5.4(c) constitute well-established, clear mandates of public policy supporting his claim for wrongful termination.

 DeFoe acknowledges that he was an at-will employee. "Generally, at-will employees may be terminated for any reason or for no reason." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. banc 2010). "As a matter of law, the discharged at-will employee has no cause of action for wrongful discharge." *Id.*

 But, despite the general rule, "the at-will-employment doctrine is not static." *Id.* at 92. "It may be modified directly by or through public policy reflected in the constitution, a statute, a regulation promulgated pursuant to statute, or a rule created by a governmental body." *Id.* "To find otherwise would allow employers to discharge employees, without consequence, for doing that which is beneficial to society." *Id.* Accordingly, the Missouri Supreme Court adopted the public-policy exception to the at-will employment doctrine. *Id.*

> An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2)

for reporting wrongdoing or violations of law to superiors or public authorities.

*Id.* "If an employer terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception." *Id.*

Following the Missouri Supreme Court's decision in *Fleshner*, the Court of Appeals recognized a third category in the public policy exception: at-will employees may not be terminated for "acting in a manner public policy would encourage." *Delaney v. Signature Health Care Found.*, 376 S.W.3d 55, 57 (Mo. App. E.D. 2012). DeFoe argues that he engaged in protected conduct under the second and third categories, as recognized in Rules 4-1.1 and 4-5.4(c).[3] Employer counters that those rules do not meet the necessary criteria for establishing public policy under the recognized exception to the at-will employment doctrine.

 "The public policy exception to the at-will employment rule, often called the wrongful discharge doctrine, is very narrowly drawn." *Margiotta v. Christian Hosp. N.E. N.W.*, 315 S.W.3d 342, 346 (Mo. banc 2010). " 'Public policy' is that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo. App. W.D. 1985). "It is well-settled that public policy is not found 'in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they them-

---

**3.** Rule 4-1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

Rule 4-5.4(c) provides: "A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

selves believe to be the demands or interests of the public.'" *Margiotta*, 315 S.W.3d at 346 (quoting *In re Rahn's Estate*, 316 Mo. 492, 291 S.W. 120, 123 (Mo. 1926)). "Therefore, a wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." *Id.*

DeFoe argues that the rules of professional conduct are promulgated by the Missouri Supreme Court—a governmental body—and serve to protect the public health and welfare by regulating the practice of law. Thus, he concludes, they may serve as the basis for his claim of wrongful termination under the public policy exception.

In *Boyle*, this court recognized that, "*in certain instances*, ... professional codes of ethics" could be the source of public policy. *Boyle*, 700 S.W.2d at 871 (emphasis added). To support that assertion, *Boyle* relied on the New Jersey case of *Pierce v. Ortho Pharmaceutical Corporation*, 84 N.J. 58, 417 A.2d 505 (1980). *Id.* at 871. In *Pierce*, a medical doctor working for a pharmaceutical company objected to the manufacture and continued testing of a drug she believed to contain unsafe levels of saccharin. *Pierce*, 417 A.2d at 507. "She felt that by continuing to work on [the drug] she would violate her interpretation of the Hippocratic oath." *Id.* Because of her refusal to continue work on the drug, the doctor was forced to resign. *Id.* at 507-08. She then brought an action for wrongful termination, arguing that she was forced to resign because of her refusal to violate the Hippocratic oath in violation of public policy. *Id.* at 508.

After first recognizing a public policy exception to the employment-at-will doctrine, the New Jersey Supreme Court noted that, "[a]lthough the contours of an exception are important to all employees

at will, this case focuses on the special considerations arising out of the right to fire an employee at will who is a member of a recognized profession." *Id.* at 511. The court recognized that "[e]mployees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers." *Id.* at 512. "However," the court noted, "an employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that a particular business decision violates the employee's personal morals, as distinguished from the recognized code of ethics of the employee's profession." *Id.*

Like Missouri, the New Jersey court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Id.* Again, like Missouri, the New Jersey court recognized that sources for such public policy could be "legislation; administrative rules, regulations or decisions; and judicial decisions." *Id.* The court also noted that, "*[i]n certain instances*, a professional code of ethics *may* contain an expression of public policy." *Id.* (emphasis added). But the court cautioned that "not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession ... probably would not be sufficient." *Id.*

Turning to the facts before it, the court noted that the doctor argued "that by continuing to perform research on [the drug] she would have been forced to violate professional medical ethics expressed in the Hippocratic oath." *Id.* at 513. The doctor relied on a "part of the oath that reads: 'I will prescribe regimen for the good of my patients according to my ability and my

judgment and never do harm to anyone.' " *Id.* The court rejected the notion that this part of the Hippocratic oath constituted a "clear mandate of public policy": "Clearly, the general language of the oath does not prohibit specifically research that does not involve tests on humans and that cannot lead to such tests without governmental approval." *Id.* Accordingly, the court rejected the doctor's claim, finding that it amounted to nothing more than "a difference in medical opinions." *Id.*

In rejecting the doctor's claim, the court noted that the doctor's position

espouse[d] a doctrine that would lead to disorder in drug research. Under her theory, a professional employee could redetermine the propriety of a research project even if the research did not involve a violation of a clear mandate of public policy. Chaos would result if a single doctor engaged in research were allowed to determine, according to his or her individual conscience, whether a project should continue.

*Id.* at 514. The court concluded that "[a]n employee does not have a right to continued employment when he or she refuses to conduct research simply because it would contravene his or her personal morals," and cautioned that "[a]n employee at will who refuses to work for an employer in answer to a call of conscience should recognize that other employees and their employer might heed a different call." *Id.*

The Eastern District of this court faced a similar issue and reached a similar conclusion in *Lay v. St. Louis Helicopter Airways, Inc.*, 869 S.W.2d 173 (Mo. App. E.D. 1993). In *Lay*, a pilot was terminated after he refused to take three flights "because of his 'sincere belief that it was to[o] dangerous under' the weather conditions." *Id.* at 175. He "further stated his belief that taking the flights would have violated employer's operation manual, the 'Code of Ethics,'

and the FAA Regulations." *Id.* Contrary to the pilot's belief, his employer believed "that there was no reason that the flights that [employee] turned down should have been turned down." *Id.* The pilot filed suit for wrongful termination, alleging that "he was terminated for making a pilot judgment call." *Id.* at 176.

He determined that the flights, which he was asked to take on December 21, were not safe. He based his decision upon (1) information from the weather briefer, (2) his experience on a December 16 flight in cold weather, (3) his experience from his flying career, and (4) the extreme cold weather on December 21, which, he believed, was causing the aircraft controls to act sluggish.

*Id.* In an affidavit, the pilot asserted, "I believe that had I taken those flights against my better professional judgment, that I would have been violating the codes and regulations with which I had a professional and ethical responsibility to comply." *Id.* The pilot specifically relied on an FAA regulation providing that the "pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." *Id.* at 177. He further relied on "the Code of Ethics of the Helicopter Association International which says, 'a member's pilots will exercise their best judgment to [e]nsure a maximum safety factor at all times.' " *Id.*

The Eastern District rejected the pilot's claim, holding that "[t]he FAA's regulation concerning a pilot's responsibility and the 'Code of Ethics' requirement that a pilot use his best judgment are not clear mandates which allow employee to fall within the public policy exception." *Id.*

Here, DeFoe argues that, when he complained about the increasing workloads, he was "exercising professional judgment" based on his "belie[f]" that the increased workloads "compromised his ability to ef-

fectively and adequately represent his clients," in violation of Rules 4-1.1 and 4-5.4(c). He further argues that his complaints evidenced him "acting in a manner encouraged by public policy by asserting his professional independence."

Neither of the rules DeFoe relies on discuss attorney workload. Rule 4-1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 4-5.4(c) provides: "A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." Though an attorney must be mindful of his or her caseload, as it has *the potential* to affect his or her duty of competence under Rule 4-1.1, *State ex rel. Mo. Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 607 (Mo. banc 2012), an attorney's ability to competently handle any given caseload varies greatly by not only the individual attorney but also the complexity of each individual case.

The purpose behind the need for a "clear mandate of public policy" is to clarify the duties imposed upon employers, thereby allowing them to effectively avoid liability pitfalls. *Margiotta*, 315 S.W.3d at 346. But where, as here, a violation of the proclaimed source of public policy ultimately devolves into a question of professional judgment, employers are left to the whim of both the employee and the courts as to what conduct constitutes a violation. For example, if a workload of 85 cases caused DeFoe to breach his duty of competence, would the same be true of one of his colleagues? And what of the complexity of the cases—would DeFoe's competence be affected by 60 highly complex cases but not by 85 straightforward ones? And how does Employer draw the line between complex and straightforward cases when assigning workload? In short, neither of the rules DeFoe relies on address attorney workload, and it is a matter of professional opinion and judgment as to when a workload becomes so excessive as to affect an attorney's duty of competence. Thus, these rules do not constitute a clear mandate of public policy and cannot serve as the basis for DeFoe's wrongful termination claim.[4]

---

4. Furthermore, DeFoe's allegation that his caseload "compromised his ability to effectively and adequately represent his clients" amounts to nothing more than a conclusion. "Missouri is a fact-pleading state"; thus, the "petition must contain a short and plain statement of the facts showing that the pleader is entitled to relief." *Gerke v. City of Kansas City*, 493 S.W.3d 433, 436 (Mo. App. W.D. 2016) (quoting *Gardner v. Bank of Am., N.A.*, 466 S.W.3d 642, 646 (Mo. App. E.D. 2015)). "A petition that asserts only conclusions is insufficient, and we must disregard any conclusions that are not supported by facts." *Id.* at 436-37. "If the petition does not contain ultimate facts or allegations from which to infer those facts, we will find that the motion to dismiss for failure to state a claim was properly granted." *Id.*

Even if the rules cited could serve as a basis for DeFoe's claim, we also question whether DeFoe actually engaged in any protected conduct here. His petition alleges that he "complain[ed] about the increasing workload" and "assert[ed] his professional independence." The public policy exception protects the following conduct: (1) refusing to perform an act contrary to public policy; (2) reporting to superiors or third parties violations of law or public policy; and (3) acting in a manner encouraged by public policy. *Delaney v. Signature Health Care Found.*, 376 S.W.3d 55, 57 (Mo. App. E.D. 2012). But DeFoe never declined any new cases nor withdrew from existing ones, which would evidence both refusal and acting in a manner encouraged by public policy. Nor did he report any alleged violation, actual or potential, to the appropriate professional authority—the Office of Chief Disciplinary Counsel. Presumably the lack of report was because there was not yet an actual or impending violation to be reported. If an

*See McGonagle v. Union Fid. Corp.*, 383 Pa.Super. 223, 556 A.2d 878, 885 (1989) ("when the act to be performed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question.").

DeFoe relies on a series of cases involving wrongful terminations based upon violations of public policy as found in the Nursing Practice Act (NPA), §§ 335.011 to 335.096. *See Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579 (Mo. banc 2013); *Hughes v. Freeman Health Sys.*, 283 S.W.3d 797 (Mo. App. S.D. 2009); *Kirk v. Mercy Hosp. Tri-Cty.*, 851 S.W.2d 617 (Mo. App. S.D. 1993). These cases all stand for the proposition that "the NPA encompasses a 'clear mandate of public policy.'" *Farrow*, 407 S.W.3d at 597 (citing both *Kirk* and *Hughes*). DeFoe argues that the public policy identified in the NPA is virtually indistinct from the public policy encompassed by the rules regulating attorney conduct laid out in Rule 4 (protecting the public) and that Rules 4-1.1 and 4-5.4(c) are no less clear than the NPA. We disagree.

First, unlike Rules 4-1.1 and 4-5.4(c), the public policies embedded in the NPA do not "cause the duties imposed upon employers [to] become more vague and create difficulties for employers to plan around liability based on the vagaries of judges." *Farrow*, 407 S.W.3d at 598 (quoting *Margiotta*, 315 S.W.3d at 346). "The NPA is a short statutory scheme, primarily consist-ing of rules regarding licensing, discipline, and State Board of Nursing regulations. The remaining few statutes under the NPA that enumerate nursing duties do not pose significant impediments for hospitals and other employers to plan around liability." *Id.*

Rule 4, governing attorney professional conduct, does not address how an attorney becomes licensed or what disciplinary measures will be taken in response to proven violations.[5] And, unlike nursing, there is no board responsible for creating regulations governing attorney conduct. Instead, "[t]he legal profession is largely self-governing." Rule 4[10], Preamble. "Although other professions also have been granted powers of self-government, the legal profession is unique in this respect because of the close relationship between the profession and the processes of government and law enforcement. This connection is manifested in the fact that ultimate authority over the legal profession is vested largely in the courts." *Id.*

Second, unlike a violation of the NPA, "[v]iolation of a Rule [of attorney professional conduct] should not itself give rise to a cause of action against a lawyer *nor should it create any presumption in such a case that a legal duty has been breached.*" Rule 4[20], Scope (emphasis added). The rules "are not designed to be a basis for civil liability," and their "purpose ... can be subverted when they are invoked by opposing parties as procedural weapons." *Id.* "The fact that a Rule is a just

actual violation had occurred, or was imminent, DeFoe would have been bound by the mandates of Rule 4-8.3(a) to report to OCDC and not just his superiors.

5. Rule 4-8.1 addresses conduct associated with seeking a license, but does not address the actual licensing process or requirements. Section 335.046, however, specifically lays out the steps required for a person to obtain a nursing license. Rule 4-8.5 addresses the jurisdiction of the disciplinary authority but does not address any actual forms of discipline or assign such forms to any particular misconduct. Section 335.066, on the other hand, identifies more than twenty-two specific scenarios that could result in the loss, suspension, or nonrenewal of a nursing license.

basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." *Id.* In short, *"nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." Id.* (emphasis added).[6]

Thus, contrary to DeFoe's argument, Rules 4-1.1 and 4-5.4(c) are unlike the NPA and do not express a clear mandate of public policy. In the absence of such a mandate, DeFoe's second amended petition, alleging wrongful termination in violation of public policy, fails to state a claim. His point is denied.

### Conclusion

The court did not err in dismissing DeFoe's second amended petition with prejudice for failure to state a claim. Its judgment is affirmed.

Thomas H. Newton, Presiding Judge, and James Edward Welsh, Judge, concur.

---

6. The parties argue about whether DeFoe's argument below was broad enough to encompass the entirety of Rule 4 as opposed to only the specific rules cited in his petition. We need not decide this issue, for even if DeFoe's argument below were so broad, his petition focused solely on the rules cited. Because our review is limited to the four corners of the petition in deciding whether the court erred in its dismissal for failure to state a claim, and because the petition laid out only Rules 4-1.1 and 4-5.4(c) with any specificity, we limit our review to only those rules. Accordingly, our opinion in this case should not be read to imply that there may never be a cause of action for wrongful termination in violation of public policy for a violation of Rule 4 generally or other rules of professional conduct. Though other states and federal courts have so held, *see, e.g., Balla v. Gambro, Inc.,* 145 Ill.2d 492, 164 Ill.Dec. 892, 584 N.E.2d 104 (1991); *Willy v. Coastal Corp.,* 647 F.Supp. 116 (S.D. Tex. 1986), *rev'd on other grounds,* 855 F.2d 1160 (5th Cir. 1988), that question is simply not before us.