

# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | |
|---|---|
| CITY OF OLIVETTE, MISSOURI, et al., ) | No. ED104432 |
| ) | |
| Respondents, ) | Appeal from the Circuit Court |
| ) | of St. Louis County |
| vs. ) | |
| ) | Hon. Robert S. Cohen |
| ST. LOUIS COUNTY, MISSOURI, et al., ) | |
| ) | FILED: |
| Appellants. ) | January 10, 2017 |

St. Louis County and Steve Stenger, County Executive, (collectively "the County") appeal from the summary judgment finding that the County did not have authority to enact an ordinance imposing countywide minimum standards for police. We affirm.

In December of 2015, the St. Louis County County Council adopted and approved an ordinance authorizing the County Executive to issue minimum police standards that would apply to the police departments of cities wholly or partly located in St. Louis County ("the Ordinance").[1] The Ordinance begins with the following recitals: there are 57 municipal police departments within St. Louis County; there are disparities between these departments' standards; there is an "inherent inequality of services" as a result; St. Louis County wants to ensure equal access to "consistent, quality public health and safety

---

[1] The Ordinance was enacted as Ordinance 26,254 and then codified as Section 701.205 of the St. Louis County Revised Ordinances.

services;" and "uniform fundamental standards will enhance public health and reinforce trust between law enforcement and the community." The Ordinance states that it was promulgated under authority found in its charter, the state constitution and statutes and was enacted to "enhance the public health, safety and welfare" of the people of St. Louis County.

The Ordinance requires cities to submit police standards for approval by the County Executive. The County Executive has discretion under the Ordinance to determine whether a city is in compliance with the minimum standards he issues or is otherwise operating with deficient policing services. Enforcement mechanisms in the Ordinance include pursuing equitable relief, prosecution and takeover of police services in the non-compliant city by the St. Louis County police department at the city's expense. The County Executive immediately issued minimum police standards pursuant to the Ordinance. The standards impose requirements for the licensing, training and hiring of law enforcement officers and for police department accountability and transparency.

Shortly after the standards were issued, the City of Olivette and other cities in St. Louis County ("the Cities") filed petitions challenging the County's authority to enact the Ordinance.[2] The Cities and the County filed cross-motions for summary judgment. The County contended that the Ordinance was a valid exercise of the powers granted to it as a charter county in Article VI, Sections 18(b) and 18(c) of the Missouri Constitution. Article VI, Section 18(b) requires a charter county to include provisions in its charter for the

---

[2] Two groups of cities filed separate lawsuits, which were ultimately consolidated. The plaintiff cities are Olivette, Rock Hill, Breckenridge Hills, Creve Coeur, Richmond Heights, St. Ann, Sunset Hills, Bel-Ridge, Edmundson, Kirkwood, Florissant, Clayton, Frontenac, Webster Groves, Hazelwood, Bellefontaine Neighbors and Bridgeton.

2

exercise of powers conferred specifically to it by the state constitution and the laws of the state. St. Louis County's charter includes such a provision.[3] One of the powers conferred by the state is found in Section 192.300 of the Missouri Revised Statutes, which authorizes counties to enact ordinances that enhance public health and prevent disease. Separate and apart from the authority found in that statute or section of the constitution is the power granted to charter counties by Article VI, Section 18(c) to perform the services and functions of a municipality or other political subdivision, except school districts. This authority is often referred to as a charter county's "police powers." The trial court concluded that the County was not authorized to enact this Ordinance under either of these constitutional provisions or the public health statute and entered judgment in the Cities favor. This appeal follows.

At the outset, the County asks this Court to take judicial notice of the following as set forth in its brief:

> The events which occurred in Ferguson after the Michael Brown shooting have become part of the history of the St. Louis area. In the aftermath of the events, it came to light that a number of police departments located in St. Louis County were lacking in quality standards by which most operate. Since that time it has come to be common knowledge that when police departments operate with poor or non-existent standards, there is often a negative impact upon the citizenry.

It is common knowledge that Michael Brown was shot by a police officer in Ferguson, which is in St. Louis County, and that "events" occurred thereafter. We decline to deem the County's opinion about the quality of the standards in city police departments in St. Louis County to be a fact of common knowledge appropriate for judicial notice. This Court

---

[3] See ST. LOUIS COUNTY CHARTER, Section 2.180.14 (county council "shall have, by ordinance, the power to . . . [e]xercise all powers and duties now or hereafter conferred upon counties . . . by the constitution, by law and by this charter and determine and make provision for any matter of county government not otherwise provided herein."

3

is aware of the issues that have come to light in the aftermath of events in Ferguson, as set out in the amicus curiae brief filed in support of the County by the American Civil Liberties Union of Missouri Foundation ("ACLU"). The ACLU asserts there are the following problems with municipal policing in St. Louis County: undue focus on generating revenue over public safety needs, racial bias, inconsistent standards and the so-called "muni shuffle," in which problem officers are shuffled among departments without formal discipline. It cites the published results of the United States Department of Justice's investigation into the Ferguson police department, a study of the police response to the events following the shooting of Michael Brown in Ferguson and other similar reports and commentary on these issues. The County believes, and the ACLU agrees, that countywide minimum police standards will help address these problems.

But proof—by taking judicial notice of the above or otherwise—that there is a need for improved policing standards in the municipal police departments of St. Louis County is simply not necessary for resolution of the issue before us. However real, important and urgent the need might be, the County can only legislate if it has the authority to do so. Thus, the only question here is whether the Ordinance was a valid exercise of the County's authority under the powers conferred by Article VI, Section 18(b) of the Missouri Constitution and Section 192.300 of the Missouri Revised Statutes or Article VI, Section 18(c) of the Missouri Constitution. Our review of this issue of law resolved on summary judgment is de novo, and the Ordinance is presumed valid and enforceable. Missouri Bankers Association, Inc. v. St. Louis County, 448 S.W.3d 267, 271 (Mo. banc 2014). We begin with the County's arguments regarding Article VI, Section 18(c).

**Section 18(c)**

4

The current form of Article VI, Section 18(c) of the Missouri Constitution was adopted by voter approval in 1970. It provides:

> The charter may provide for the vesting and exercise of legislative power pertaining to any and all services and functions of any municipality or political subdivision, except school districts, in the part of the county outside incorporated cities; and it may provide, or authorize its governing body to provide, the terms upon which the county may contract with any municipality or political subdivision in the county and perform any of the services and functions of any such municipality or political subdivision.

> The charter may provide for the vesting and exercise of legislative power pertaining to any and all services and functions of any municipality or political subdivision, except school districts, throughout the entire county within as well as outside incorporated municipalities; any such charter provision shall set forth the limits within which the municipalities may exercise the same power collaterally and coextensively. When such a proposition is submitted to the voters of the county the ballot shall contain a clear definition of the power, function or service to be performed and the method by which it will be financed.

This grant of authority pertains to the performance of the services and functions of a municipality both outside of and within incorporated areas of the county. The County has, in accordance with the first paragraph above, provisions in its charter that authorize it to exercise this power in unincorporated areas by ordinance. See ST. LOUIS COUNTY CHARTER, Sections 2.180.22 and 2.180.23 ("the council shall have, by ordinance, the power to. . . [f]urnish or provide within the part of the county outside incorporated cities any service or function of any municipality or political subdivision, except school districts" and to "[e]xercise legislative power pertaining to public health, police and traffic, building construction, and planning and zoning, in the part of the county outside incorporated cities, and on such other subjects as may be authorized by the constitution or by law"). A county may also perform such services and functions countywide—outside of and within incorporated cities—or within a particular municipality by contract, and the second paragraph of Section 18(c) sets out what must be in the charter provision and on the ballot

5

proposition. St. Louis County's charter provision corresponding to that constitutional authority is as follows: "the council shall have, by ordinance, the power to . . . [p]rovide the terms upon which the county shall perform any services and functions of any municipality or political subdivision in the county, except school districts, when accepted by a vote of a majority of the qualified electors voting thereon in such municipality or subdivision, which acceptance may be revoked by a like vote; and cooperate and contract with the municipalities or political subdivisions in the county as otherwise authorized by this charter and by law." ST. LOUIS COUNTY CHARTER, Section 2.180.21.[4] The trial court concluded that a vote was required in order to enact this countywide legislation, and because there was no such vote, it was not a valid exercise of the County's authority under this Section 18(c).

In its opening brief on appeal, the County first contended that voter approval was optional, not required, because the language "*when* such a proposition is submitted to voters" meant "*if* such a proposition is submitted to voters." But it also argued that it had received voter approval of provisions in its charter that authorized this Ordinance when the charter was amended in 1979. The County pointed to three general provisions in the charter, which essentially give it any and all powers available in the constitution and the

---

[4] It appears these charter provisions were based on an earlier version of Article VI, Section 18(c) of the Missouri Constitution:

> The charter may provide for the vesting and exercise of legislative power pertaining to public health, police and traffic, building construction, and planning and zoning, in the part of the county outside incorporated cities; and it may provide, or authorize its governing body to provide, the terms upon which the county shall perform any of the services and functions of any municipality, or political subdivision in the county, except school districts, when accepted by vote of a majority of the qualified electors voting thereon in the municipality or subdivision, which acceptance may be revoked by like vote.

laws of the state and require liberal construction of those powers in the County's favor.[5]

In response to the Cities' contention that the County failed to provide a limiting provision as required by Section 18(c)—"any such charter provision shall set forth the limits within which the municipalities may exercise the same power collaterally and coextensively"— the County claimed that no municipality can issue countywide standards and therefore no such limiting language was required. In the County's reply brief, that claim morphed into an argument that not only was no such limiting language required in the provision because this was not a municipal function, but also that an election would only be required if the County were in fact providing a service or function that could also be provided by a municipality. In the next breath of the reply brief, however, the County returned to its position that voter approval is optional based on its construction of the word "when."

By the time of oral argument, the County took this argument one step further and claimed that because the issuance of countywide minimum police standards was not a service or function of a municipality, Section 18(c) was not even applicable in the first place. We could speculate that the County's shifting position on Section 18(c) demonstrates its concern about the lack of voter approval for this countywide action.[6] But

---

[5] The cited charter provisions declare that St. Louis County shall have "all the powers possible for a county to have under the constitution and laws of Missouri" and that "[t]he powers of the county under this charter shall be construed liberally in favor of the county, and the specific mention of particular powers in this charter or in any law shall not be construed as limiting in any way the general powers stated in this article." ST. LOUIS COUNTY CHARTER, Sections 1.030, 1.040; see also ST. LOUIS COUNTY CHARTER, 2.180.14, n.3 *supra.*

[6] The Supreme Court has expressly held that "[t]he second paragraph of section 18(c) requires a charter amendment when the County seeks to exercise countywide legislative power." Chesterfield Fire Protection District of St. Louis County v. St. Louis County, 645 S.W.2d 367, 370 (Mo. banc 1983). And amendments to St. Louis County's charter require voter approval. See ST. LOUIS COUNTY CHARTER, Article X (charter may be amended in enumerated ways, each of which requires a vote); see also MO. CONST., Article VI, Sections 18(h) and 18(k) (regarding the adoption and amendment of charters by voter approval). The County used this very procedure when it attempted unsuccessfully in 1971 to impose a similar set of countywide police standards. That ballot proposition proposed to amend the charter to require every municipal police department in St. Louis County to provide 24-hour police service, to create a police standards commission, which would determine compliance with that requirement, and to authorize the county police department to

7

because the County has abandoned reliance on Section 18(c) as authority for the enactment of this Ordinance, we need not address the applicability of that authority any further or decide if voter approval is required. Rather, we turn to whether enactment of this Ordinance was a valid exercise of the County's authority under Article VI, Section 18(b) of the constitution and Section 192.300 of the statutes, which do not require voter approval or depend on whether the action occurs within or outside of incorporated areas.

### Section 18(b) and Section 192.300

As required by Article VI, Section 18(b), St. Louis County's charter provides that it may, via ordinance, exercise any power conferred to it by the state. See ST. LOUIS COUNTY CHARTER, Section 2.180.14. The County contends this Ordinance is a valid exercise of its authority under Section 192.300 of the Missouri Revised Statutes, which confers on all counties the power to make "additional health rules" to those promulgated by the Department of Health and Senior Services, so long as they do not conflict with the department's rules:

> 192.300. Counties may make additional health rules—fees may be charged, deposit in county treasury, purpose—individuals unable to pay not to be denied health services—records and publication—violation a misdemeanor.
>
> The county commissions and the county health center boards of the several counties may make and promulgate orders, ordinances, rules or regulations, respectively **as will tend to enhance the public health and prevent the entrance of infectious, contagious, communicable or dangerous diseases into such county,** but any orders, ordinances, rules or regulations shall not be in conflict with any rules or regulations authorized and made by the department of health and senior services in accordance with this chapter or by the department of social services under chapter 198. The county commissions and the county health center boards of the several counties may establish reasonable fees to pay for any costs incurred in

---

perform those services if the municipal department failed to do so, at the expense of the offending municipality.

8

carrying out such orders, ordinances, rules or regulations, however, the establishment of such fees shall not deny personal health services to those individuals who are unable to pay such fees or impede the prevention or control of communicable disease. Fees generated shall be deposited in the county treasury. All fees generated under the provisions of this section shall be used to support the public health activities for which they were generated. After the promulgation and adoption of such orders, ordinances, rules or regulations by such county commission or county health board, such commission or county health board shall make and enter an order or record declaring such orders, ordinances, rules or regulations to be printed and available for distribution to the public in the office of the county clerk, and shall require a copy of such order to be published in some newspaper in the county in three successive weeks, not later than thirty days after the entry of such order, ordinance, rule or regulation. Any person, firm, corporation or association which violates any of the orders or ordinances adopted, promulgated and published by such county commission is guilty of a misdemeanor and shall be prosecuted, tried and fined as otherwise provided by law. The county commission or county health board of any such county has full power and authority to initiate the prosecution of any action under this section.

MO. REV. STAT. Section 192.300 (emphasis added).

Based on the language in bold above, our courts have framed the issue as whether the ordinance in question "bears a reasonable relation to public health enhancement and disease prevention." Avanti Petroleum, Inc. v. St. Louis County, 971 S.W.2d 506, 509 (Mo. App. E.D. 1998) (citing Readey v. St. Louis County Water Company, 352 S.W.2d 622 (Mo. 1961)). In Avanti, this Court found that an ordinance "preventing sales of tobacco to minors to reduce or prevent their use of such products" bore a "reasonable relation to reducing dangerous disease." 971 S.W.2d at 509. In Readey, the Supreme Court found that an ordinance ordering the addition of fluoride to the county water supply would prevent and reduce the widespread and serious disease of dental decay and would be an efficacious "public health measure." 352 S.W.2d at 627. Other cases have similarly analyzed the ordinance in terms of its relation to the prevention of disease and enhancement of public health. See Professional Houndsmen of Missouri, Inc. v. County of Boone, 836

9

S.W.2d 17, 19 (Mo. App. W.D. 1992) (finding ordinance imposing requirements on animal owners enhanced public health "by preventing rabies and animal bites" and was "reasonably related to the purpose of public health enhancement and disease prevention"); Borron v. Farrenkopf, 5 S.W.3d 618, 622 (Mo. App. W.D. 1999) (finding ordinance regulating animal feeding operations "rationally related to the purpose of public health enhancement and disease prevention" because of link between human diseases and livestock animal waste). In each case, the courts found that those ordinances were valid exercises of the authority in Section 192.300 specifically because they would prevent the spread of some disease.

The Ordinance in this case, authorizing the issuance of minimum police standards, has nothing to do with the prevention of any disease. The County concedes as much, but argues that, despite the plain and ordinary meaning of the word "and" in the statute, an ordinance under Section 192.300 need not both enhance public health and prevent disease. Rather, it contends, counties are empowered under that section to enact legislation that will either enhance public health or prevent disease. While "and" can mean "or," and vice versa, most commonly "and" simply means "and." See Stiers v. Director of Revenue, 477 S.W.3d 611, 615 (Mo. banc 2016). Only when there are strong reasons and the context favors doing so to give effect to the legislative intent should courts resort to reading "and" as a disjunction instead of a conjunction. See Hawkins v. Hawkins, 511 S.W.2d 811, 813 (Mo. 1974). The County argues that if the legislature had intended to limit the authority to only ordinances that prevent disease, there would have been no reason to include the phrase "enhance public health" and that term would be rendered meaningless if "and" were construed as a conjunction. The converse is also true though: if the legislature had intended

10

to authorize any measure that enhances public health, there would have been no reason to specifically mention preventing disease because that would certainly be encompassed in the more general phrase "enhancing public health."

The County has failed to show a strong reason for construing "and" to mean "or." The plain meaning of the statute—as followed in the cases discussed above—demonstrates the legislature's intent in Section 192.300 was to authorize counties to enact only ordinances that enhance public health and prevent disease. Moreover, the context in which the statute must be read demonstrates that, even if the authority is broad enough to encompass other public health matters beyond just the prevention of disease, the legislature did not intend for it to include law enforcement. Minimum standards for law enforcement is a matters of public safety, not public health.

In reaching this conclusion, we follow the primary rule of statutory interpretation to give effect to legislative intent as reflected in the plain language of the statute. State ex rel. Burns v. Whittington, 219 S.W.3d 224, 225 (Mo. banc 2007). "In the absence of statutory definitions, the plain and ordinary meaning of a term may be derived from a dictionary and by considering the context of the entire statute in which it appears." Id. The term "public health" is not defined in Section 192.300 or elsewhere in the statute. According to the consensus of definitions of "public health" and "health" in standard and legal dictionaries, the term refers to the physical and mental well-being, particularly freedom from illness and injury, of the community at large.[7] On the face of this broad and

_____

[7] Black's Law Dictionary defines "public health" as "the health of the community at large" and "the healthful or sanitary condition of the general body of people or the community en masse; esp., the methods of maintaining the health of the community, as by preventive medicine and organized care for the sick." "Health" is "the quality, state, or condition of being sound or whole in body, mind, or soul; esp., freedom

11

general definition of "public health"—and without any context—one could say that just about any legislation designed to improve government services to the public, including the imposition of minimum police standards, enhances the physical and mental well-being of the community. But when read in context, it is clear that matters relating to law enforcement are not within the scope of what the legislature meant by "enhance of public health."

This statute is located in the chapter creating the Department of Health and Senior Services, which is charged with developing a comprehensive disease prevention plan, studying the causes and prevention of diseases, designating "infectious, contagious, communicable or dangerous" diseases and making adequate rules to prevent the spread of such diseases. See Mo. REV. STAT. Sections 192.011.2 and 192.020.1. Thus, Chapter 192 addresses the Department of Health's authority with respect to such matters as hepatitis C, hygiene, disinfecting contaminated spaces, radiation, cancer, childhood immunizations, arthritis, head and spinal cord injuries, mammography, weight loss, epilepsy, women's health and animal diseases communicable to humans. Likewise, the Department of Health's Division of Community and Public Health has rules on the following topics: food protection, protection of drugs and cosmetics, general sanitation, lead program, toxic

---

from pain or sickness" and "the relative quality, state, or condition of one's physical or mental well-being, whether good or bad."

Webster's Third International Dictionary defines "public health" as "the art and science dealing with the protection and improvement of community health by organized community effort and including preventative medicine and sanitary and social science." "Health" is "the condition of being sound in body, mind, or spirit; especially: freedom from physical disease or pain" and "the general condition of the body."

The Oxford Dictionary defines "public health" as "the health of the population as a whole, especially as monitored, regulated, and promoted by the state," and "health" is "the state of being free from illness or injury."

substances, protection against radiation, communicable diseases, typhoid carriers, dead bodies infected with a communicable disease, STDs, HIV/AIDS medication programs, dispensing medicine during emergencies, prescription drug repository program and hemp extract registration. See 19 C.S.R 20-1.010 through 29 C.S.R 20-51.010.

The legislature created a distinct and separate entity to handle matters of law enforcement: the Department of Public Safety. That department's role is to "provide overall coordination in the state's public safety and law enforcement program" and to coordinate other agencies on public safety and law enforcement matters. Mo. REV. STAT. Section 650.005.1. The duties of the state highway patrol, liquor control, fire prevention (formerly a bureau of the public health department), the state militia, the state's boat commission and veteran's commission are part of the Department of Public Safety. See Mo. REV. STAT. Section 650.005.2-10. Chapter 650 addresses the Department of Public Safety's authority with respect to motor vehicle regulations, community crime-tip programs, missing endangered persons procedures, firearms training and qualifications for retired law enforcement officers carrying concealed weapons, a DNA profiling system, crime laboratories, drug enforcement, regulation of boilers, an office for victims of crimes and emergency communications systems. The Department of Public Safety has rules relating to fireworks, amusement rides, elevators, gaming, boating and water skiing. See 11 C.S.R. 40.1.010, *et seq.* In fact, the Department of Public Safety is the agency that promulgated the state minimum standards for law enforcement officers known as POST, the "Peace Officer Standards and Training Program." See Mo. REV. STAT. Section 590.010 and 11 C.S.R. 75-1.010, *et seq.*

13

By creating different departments to address "public safety" and "public health," the legislature has indicated that it considers these two different and distinct areas of government authority. In fact, throughout the revised statutes, the legislature has used these terms in a way that demonstrates they are distinct, such as in the phrase "public health, safety and welfare." We must presume the legislature did not intend, therefore, for these phrases to be synonymous or redundant and that each of these terms mean something different. See Young v. Boone, 462 S.W.3d 783, 792-93 (Mo. App. W.D. 2015). Because the legislature did not include in its grant of authority to counties in Section 192.300 the power to enact ordinances that enhance public safety, and only used the term public health, it must not have intended to confer—at least in this statute—the power to legislate on matters of public safety. It may not be possible to define all the actions the legislature intended to be covered by the phrase "enhance public health." But we know at least that it does not include that which is a matter of law enforcement because the legislature has placed law enforcement squarely within the realm of public safety, as opposed to public health. Compare Mo. REV. STAT. Chapters 192 and 650, *supra*. Likewise, St. Louis County's charter itself recognizes that law enforcement is not a matter of public health, as like the State, it too has separate departments for "community health and medical care" and "police." See ST. LOUIS COUNTY CHARTER, Article IV.

The County's reliance on information presented to the County Council as to the impact of this Ordinance on public health does not aid its argument for how this was a valid exercise of authority under Section 192.300.[8] The positive impact that improved law

---

[8] Former Chief of Police for the City of St. Louis, Dr. Daniel Isom, and the Director of the St. Louis County Health Department, Dr. Faisal Khan, expressed at the public hearing before adoption of the Ordinance their belief that law enforcement standards would enhance the health of citizens in St. Louis County. The Cities claim the "unsworn, unsubstantiated opinions of Dr. Khan and Dr. Isom" are not only irrelevant to the

14

enforcement may have on the public—including the extent to which it improves the community's physical and mental well-being—is simply not what was meant by "enhance public health" in Section 192.300. To hold otherwise would be to broaden the scope of authority beyond what the legislature intended by granting counties the power to make "additional health rules" in Section 192.300.[9] Thus, this Ordinance was not a valid exercise of the County's authority conferred by that statute.

All points are denied, and the judgment is affirmed.

ROBERT G. DOWD, JR., Judge

Angela T. Quigless, P. J. concurs with opinion of Judge Robert G. Dowd, Jr.
Lisa S. Van Amburg, J., concurs in separate concurring opinion.

---

determination of the validity of the Ordinance—as opposed to its reasonableness, which they claim is not before us—but also insufficient to support a grant of summary judgment in the County's favor.

[9] The Cities contend that under the County's theory of "public health," Section 192.300 would allow a county to legislate matters relating to municipal roads and sidewalks simply because someone traveling on them could be injured or municipal parks simply because they provide healthy exercise opportunities. As the Cities put it, the legislature did not intend to hide such an "elephant" of unbridled authority in a "mouse hole" of the term "enhance public health."



# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | | |
|---|---|---|
| CITY OF OLIVETTE, et al, | ) | No. ED104432 |
| | ) | |
| Respondents, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | |
| | ) | |
| ST. LOUIS COUNTY, et al., | ) | Hon. Robert S. Cohen |
| | ) | |
| Appellants. | ) | FILED: January 10, 2017 |

## CONCURRING OPINION

I concur in the majority opinion insofar as it holds that the ordinance is beyond the scope of §192.300. In my view, however, voter approval of the ordinance as an assumption of municipal functions is required only by §2.180.21 of the County's charter and not by Article VI §18(c) of the Missouri Constitution.

As the majority notes, §2.180.21 of the charter authorizes the county to perform municipal services and functions "when accepted by a vote of a majority of the qualified electors ... ." This requirement alone is fatal to the County's position. But regardless of whether an earlier version of Article VI §18(c) of the Missouri Constitution mirrored this language, I do not construe the current version to mandate a vote. Missouri voters approved and adopted the current version of §18(c) in 1970. It states that, "*When* such a proposition is submitted to the voters of the county[,] the ballot shall contain a clear definition of the power, function or service to be

performed and the method by which it will be financed." I interpret this to mean that, when the nature of the ordinance is such that it requires a vote under a county's charter, then the ballot measure should contain sufficient specifics to inform the voters' decision. In other words, this sentence simply prescribes the content of the ballot.

Therefore, I would opine that the ordinance does not exceed the county's authority under the Missouri Constitution, but voter approval is still required under the county's charter.

_Lisa L. Van Amburg_

Lisa Van Amburg, Judge

2