Karen King Mitchell, Chief Judge
BNSF Railway Company (BNSF) appeals the denial of its motion for judgment notwithstanding the verdict following a jury trial and judgment awarding Thomas and Dana Tubbs (the Tubbses)[1] $2,598,000 in actual damages and $1,231,000 in punitive damages for BNSF's negligence in *328 failing to provide adequate drainage for a portion of track that bisects the Tubbses' farm. BNSF argues that the trial court erred in denying BNSF's motion because the Tubbses failed to make a submissible case as to (1) the applicable standard of care and (2) punitive damages. BNSF also argues that the trial court erred in refusing BNSF's withdrawal instructions pertaining to evidence of (1) the height and design of the track and (2) an intentional breach of the track. Because we find that the Tubbses made a submissible case on the standard of care and punitive damages and that the trial court did not abuse its discretion in denying BNSF's withdrawal instructions, we affirm the trial court's denial of BNSF's motion for judgment notwithstanding the verdict.
Background[2]
The Tubbses own and operate a farm in a floodplain near the Missouri River in Holt County, Missouri. The farm is located just southeast of Big Lake and about three-and-a-half miles east of the Missouri River. BNSF, an interstate freight railroad, owns and operates a track that runs east to west across the floodplain and bisects the Tubbses' farm. The track sits atop an earthen embankment, which was originally built in 1887.
The embankment blocked the free flow of occasional floodwaters from the Missouri River. In response to recurrent flooding over the years, BNSF incrementally raised the height of the track and added more ballast (crushed rock) between the embankment and the track to prevent water from spilling over the track and interrupting rail service. But, as the height of the track increased, BNSF did not provide additional drainage capacity (e.g. , bridges or culverts) to address the increased volume of dammed water. Record-setting floodwaters from the Missouri River breached the embankment in July 2011 and damaged the Tubbses' farm.
In 2012, the Tubbses filed a lawsuit in Holt County Circuit Court against BNSF and its contractor, Massman Construction Company, seeking actual and punitive damages for state-law torts, including trespass, nuisance, negligence, inverse condemnation, and statutory trespass in connection with the embankment breach.[3] After discovery, BNSF moved for summary judgment on the ground that federal law preempted the Tubbses' state-law claims. The Tubbses requested and obtained a stay from the trial court so they could seek a Declaratory Order from the Surface Transportation Board (STB) addressing whether their state-law claims were preempted by federal law.
In 2014, the STB concluded that the Tubbses' state-law claims were related to the design, construction, and maintenance of BNSF's rail line and, therefore, were preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, et seq. (ICCTA).[4] Thomas Tubbs , No. FD 35792, 2014 WL 5508153, *4 (STB Service Date: Oct. 31, 2014). But, to the extent the Tubbses' claims were based on alleged violations of the Federal Railroad Administration's (FRA) Federal Railroad Safety Act (FRSA) regulations (specifically *329 49 C.F.R. §§ 213.33 and 213.103(c) ),[5] they were not preempted because "the FRSA regulations that Petitioners cite are applicable to the entire national rail system and do not directly conflict with the uniform federal regulation of railroads under the Interstate Commerce Act." Id. at *7. The Tubbses filed a petition for review of the STB's decision with the U.S. Court of Appeals for the Eighth Circuit. Tubbs v. Surface Transp. Bd. , 812 F.3d 1141 (8th Cir. 2015). The Eighth Circuit denied their petition, leaving the STB's decision in place. Id. at 1146.
Following the STB and Eighth Circuit decisions, the Tubbses filed a Second Amended Petition relying on the same factual assertions but consolidating their allegations into a single claim of negligence based on two FRSA regulations-the drainage regulation in 49 C.F.R. § 213.33 and the ballast regulation in 49 C.F.R. § 213.103.[6] At trial, the Tubbses did not pursue their negligence claim based on the ballast rule in § 213.103, but instead proceeded solely on their claim under the drainage rule in § 213.33. The verdict-directing instruction given to the jury paraphrased the language of § 213.33, which states, in full, "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." Specifically, the verdict-directing instruction stated,
Your verdict must be for plaintiffs, if you believe:
First, defendants failed to maintain and keep free of obstruction each drainage or other water carrying facility under or immediately adjacent to the roadbed to accommodate expected water flow for the area concerned, and
Second, defendant was thereby negligent, and
Third, as a direct result of such negligence plaintiffs sustained damage.
Over BNSF's objection, the court also instructed the jury to decide whether punitive damages should be awarded against BNSF.
The following evidence favorable to the jury's verdict was adduced at trial. Historically, the valley where the Tubbses' farm is located had experienced several large floods, including floods in 1952, 1967, 1973, 1984, 1993, 2007, 2008, and 2010. In response to, or anticipation of, these events, BNSF occasionally raised the height of its track to prevent water from spilling over it and interrupting rail service, but BNSF never added any new openings in the embankment to allow for cross-drainage. Each time BNSF raised the track to protect it from expected water flow, the increase in height, together with the lack of additional drainage, increased the damming capability of the embankment because, as the track grew in height, the more water it would block, thereby raising the pressure on the embankment.[7] During *330 flooding, the absence of cross-drainage produced a water pressure differential-more water and greater water pressure on the upstream (northern) side of the embankment and substantially less water and thus lower water pressure on the downstream (southern) side. During the 2011 flood, the water on the north side of the embankment was approximately two feet deeper than the water on the south side. The uneven water pressure forced water to flow through the soil in the embankment, eroding the fine sediment therein, and eventually causing the breach that is the subject of this lawsuit.
Upstream from the Tubbses' farm, the U.S. Army Corps of Engineers (the Corps) operates a series of five large reservoirs. In 2007, the Corps publicly announced that it would be releasing a larger volume of water from its reservoirs in the future, which would increase the flow of the Missouri River, creating a greater likelihood of downstream flooding.
In the spring of 2011, BNSF knew there "was a possibility that there would be flooding" in the Missouri River Basin that year. The previous winter had been the snowiest in recent years in the northern region, and the eventual snowmelt significantly raised water levels in the Corps' reservoirs. Then, both April and May of 2011 had record-setting rainfall in the upper Missouri River Basin. The rain in May nearly filled the Corps' reservoirs to capacity. By the end of May, the Corps announced that it planned to release 150,000 cubic feet of water per second from its Gavins Point reservoir in South Dakota.
In May and June of 2011, BNSF hired engineering consultants to advise it regarding the anticipated flooding that summer. At the time, BNSF's embankment had one drainage opening in its five-mile span, which was a bridge 134 feet in length. One consultant advised BNSF that four additional drainage openings in the embankment and a substantial increase in the existing opening were needed to address the anticipated water flow. Specifically, the consultant indicated that the height and length of the track necessitated ten times the amount of existing drainage through the embankment to accommodate expected water flow.
Around the same time, BNSF raised its mainline track and fortified the entire track structure by placing rock, riprap, and other material trackside. BNSF focused its efforts on raising its track east of Big Lake-a stretch of about a mile-where the track sat at a slightly lower elevation.[8] However, BNSF "ran out of time." Also, in the initial stages of the flood, before the embankment breach at the Tubbses' farm, BNSF contractors were "out there mobilizing to start building bridges." BNSF "knew [they] were going to do something. [They] just didn't know exactly what."
On June 19 or 20, 2011, a levee about eight miles north of Big Lake collapsed. The breach was several hundred feet wide and allowed a tremendous volume of water to move south, requiring the evacuation of local community members, including the Tubbses. Floodwaters quickly reached the north side of BNSF's embankment, and BNSF stopped operating freight trains on that segment of the line on June 20 because the track was submerged.
*331 In an effort to restart service, BNSF had internal discussions about the possibility of intentionally cutting holes in the embankment where the track ran along another farm to allow water to pass to the south side of the embankment equalizing the water pressure so the company could start rebuilding the embankment under the roadbed. At trial, the Tubbses introduced an internal BNSF email indicating that the railroad had intentionally breached the embankment to relieve pressure created by the floodwaters. But witnesses testified that BNSF never actually intentionally breached the embankment, and the Tubbses did not submit the claim of intentional breach to the jury.
The difference in surface water elevations on the north and south sides of the embankment produced a water pressure differential that was too great for the embankment to withstand, and, on July 21, 2011, the embankment failed at the site of the Tubbses' farm. The breach in the embankment adjacent to the Tubbses' farm eventually grew to a width of 900 feet. As the embankment gave way, the water rushed from north to south with such velocity that it scoured holes on the Tubbses' farm down to bedrock. The scour holes covered almost forty acres and were sixty feet deep in places. When the floodwaters finally receded, they left large sand deposits on approximately 385 acres of the farm; in some places, the sand was eight feet deep. A farm appraiser estimated that the difference in the value of the Tubbses' farm before and after the embankment breach was $2,598,000.
During the instruction conference, BNSF's counsel proposed the following withdrawal instructions relevant to this appeal:
Instruction No. C-The evidence of the height of Defendant's track or increases in height of Defendant's track is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
Instruction No. E-The design of Defendant's track structure is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
Instruction No. A-Any evidence concerning intentional breach of the roadbed is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
The trial court rejected these withdrawal instructions, but instructed the Tubbses' counsel "to not argue intentional breach" in his closing statement.
When the Tubbses' counsel raised arguments about the height of the track during his closing argument, BNSF renewed its objection on preemption grounds. This time, the trial court sustained BNSF's objection and told the Tubbses' counsel in a sidebar discussion: "And to correct this ..., I'm going to instruct you to explain [to the jury] that the pertinent issue is the drainage of the water." Counsel then turned to the jury and said: "So I want to make sure that the complaint is not that they raised the track by [two] foot; that's not the issue. It's raising the track with no drainage; [they] didn't add one more foot of opening."
The jury returned a verdict in favor of the Tubbses, awarding them $2,598,000 in compensatory damages and $1,231,000 in punitive damages, and the trial court entered its judgment accordingly. BNSF filed a timely Motion for Judgment Notwithstanding the Verdict and Alternatively for a New Trial or to Amend the Judgment, in which BNSF raised the four issues, among others, on appeal here. The trial court denied BNSF's motion in its entirety. This appeal follows.
*332 Analysis
BNSF raises four points on appeal. In Points I and II, BNSF argues that the trial court erred in denying BNSF's motion for judgment notwithstanding the verdict because the Tubbses failed to make a submissible case as to (1) the applicable standard of care (Point I) and (2) punitive damages (Point II). In Points III and IV, BNSF argues that the trial court erred in refusing BNSF's withdrawal instructions pertaining to evidence of (1) the height and design of the track (Point III) and (2) an intentional breach of BNSF's embankment (Point IV). We discuss each point in turn.
1. The Tubbses presented a submissible case on the standard of care.
A. Standard of Review
"When reviewing a circuit court's overruling of a motion for judgment notwithstanding the verdict, [the reviewing court] 'must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability.' " Newsome v. Kansas City, Mo. Sch. Dist. , 520 S.W.3d 769, 775 (Mo. banc 2017) (quoting Fleshner v. Pepose Vision Inst., P.C. , 304 S.W.3d 81, 95 (Mo. banc 2010) ). In conducting this review, courts view the evidence and all reasonable inferences drawn therefrom "in the light most favorable to the jury's verdict." Id. (quoting Fleshner , 304 S.W.3d at 95 ). "Whether the plaintiff made a submissible case is a question of law that [appellate courts review] de novo. " Id. (quoting Ellison v. Fry , 437 S.W.3d 762, 768 (Mo. banc 2014) ). Here, application of the de novo standard of review is also appropriate because the applicable standard of care is derived from a regulation, and thus "this case involves the application and interpretation of a regulation, [which we review] de novo. " Stiers v. Dir. of Revenue , 477 S.W.3d 611, 614 (Mo. banc 2016).
B. Standard of Care
To present a submissible case of negligence, "a plaintiff is required to prove: (1) the existence of a duty on the part of the defendant; (2) the failure of defendant to perform that duty; and (3) an injury to plaintiff directly and proximately resulting from the defendant's failure to perform the duty." Poloski v. Wal-Mart Stores, Inc. , 68 S.W.3d 445, 449 (Mo. App. W.D. 2001). In its first point on appeal, BNSF asserts that, at trial, the Tubbses failed to make a submissible case on the duty of care owed by BNSF. Central to this issue is what 49 C.F.R. § 213.33 requires of railroads. Specifically, does it require railroads to add or expand drainage facilities to accommodate expected water flow (as the Tubbses suggest), or does it merely require that they maintain the structural integrity of existing drainage facilities and ensure that they are free of obstruction (as BNSF suggests)?
Before examining BNSF's assertion on this point, however, we must first address the Tubbses' claim that the STB and the Eighth Circuit decisions are the law of the case on the nature of BNSF's duty of care. The Tubbses sought a stay of their state court action so that the STB could determine whether the Tubbses' state-law claims were preempted under the ICCTA. Although the Tubbses' petition for damages pending at that time in state court did not raise claims based on an alleged violation of 49 C.F.R. § 213.33, the Tubbses' Petition for a Declaratory Order, filed with the STB, did ask the STB to determine whether a claim based on a violation of § 213.33 would be preempted by the ICCTA. In its decision on the preemption of the Tubbses' state-law claims, the STB stated,
Here, the FRSA regulations that Petitioners cite [ 49 C.F.R. §§ 213.33 and *333 213.103(c) ] are applicable to the entire national rail system and do not directly conflict with the uniform federal regulation of railroads under the Interstate Commerce Act. Accordingly, § 10501(b) does not preempt the FRSA regulations on drainage under railroad tracks. Petitioners' claims based on alleged violations by BNSF of these regulations are therefore also not preempted by § 10501(b).
Thomas Tubbs , 2014 WL 5508153, *7. The Eighth Circuit decision, which denied the Tubbses' petition for review of the STB's decision and, therefore, left that decision intact, stated,
Moreover, the Tubbses cannot prevail under their own test [for preemption of their state-law claims] because they have not established that they have no federal remedies remaining. Indeed, they embrace the surviving tort claims that are "based on alleged violations of BNSF of [the FRSA] regulations."
....
Additionally, the Tubbses have not explained why their remaining federal remedies-including their claim that BNSF is liable under the FRSA-are insufficient to protect their constitutional rights.
Tubbs , 812 F.3d at 1145.
In their brief, the Tubbses argue that the STB and Eighth Circuit made these statements "in full recognition of the fact that the Tubbses' claim was premised on BNSF's failure to have sufficient drainage openings under its track." The Tubbses interpret these statements by the STB and Eighth Circuit as validating their interpretation of § 213.33, i.e. , that the rule imposed a duty on BNSF to add additional drainage if the existing drainage was insufficient to accommodate the expected water flow. The Tubbses contend that the STB and Eighth Circuit resolved the issue of whether BNSF had a duty to add drainage, that their resolution of that issue is the law of the case, and that the only issues left for the jury under the facts of this case were whether the railroad breached its duty, whether the breach caused damage to the Tubbses, and what the amount of any damage was.
Under the law-of-the-case doctrine, "a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal." Walton v. City of Berkeley , 223 S.W.3d 126, 128-29 (Mo. banc 2007) (quoting State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n , 40 S.W.3d 381, 388 (Mo. App. W.D. 2001) ). "The doctrine governs successive adjudications involving the same issues and facts." Id. at 129 (quoting Alma Tel. , 40 S.W.3d at 388 ). "Generally, the decision of a court is the law of the case on all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not." Id. (quoting Alma Tel. , 40 S.W.3d at 388 ). "The doctrine [e]nsures uniformity of decisions, protects the parties' expectations, and promotes judicial economy." Id. "The doctrine of law of the case, however, is not absolute." Alma Tel. , 40 S.W.3d at 388. "Rather, the doctrine is a rule of policy and convenience; a concept that involves discretion." Id. "[W]here the issues or evidence ... are substantially different from those vital to the first adjudication and judgment, the rule may not apply." Id.
We disagree with the Tubbses that the law-of-the-case doctrine precludes us from reviewing the trial court's interpretation and application of § 213.33 in this case. The Tubbses read the portions of the STB and Eighth Circuit decisions addressing their FRSA claim too broadly. Neither tribunal interpreted the drainage regulation *334 or applied it to the facts of this case.[9] Instead, both the STB and the Eighth Circuit merely concluded that a claim based on § 213.33 was not preempted by the ICCTA. The issue before the STB and Eighth Circuit-whether the Tubbses' claim under § 213.33 was preempted-is substantially different from the question of how the regulation should be interpreted. Additionally, where the prior tribunals did not construe or apply the regulation, the typical concerns underlying the law-of-the-case doctrine about uniformity of decisions, judicial economy, and the parties' expectations do not arise. At trial, the parties spent considerable time and energy arguing the meaning of § 213.33 (in addition to how it applied to BNSF under the facts of this case), which suggests that the parties had no expectation that the issue had been resolved by either the STB or Eighth Circuit decision.
The Tubbses argue that, even if the proper interpretation of § 213.33 was not resolved by the STB, the railroad could have raised the issue and thus the law-of-the-case doctrine still applies. We disagree. The FRA, not the STB, is the federal agency charged with promulgating, interpreting, and enforcing the FRSA regulations, which include the drainage regulation. Moreover, even if the STB could have interpreted § 213.33, it was the Tubbses who sought a stay of the state case in order to seek guidance from the STB, yet they never raised the issue of the proper interpretation of § 213.33 with the STB.
Therefore, we reject the Tubbses' claim that the STB and Eighth Circuit decisions are the law of the case on the nature and scope of the duty § 213.33 imposed on BNSF.[10]
Having determined that the STB and Eighth Circuit decisions did not address the nature of the duty owed under § 213.33, we now turn to that issue. And, consistent with our applicable standard of review, we analyze the issue anew, applying the same principles applicable at the trial court level.
When addressing a standard of care issue, it is the court's responsibility to define the standard of care and the jury's responsibility to determine whether the defendant fell short in meeting that duty. See Thompson v. Brown & Williamson Tobacco Corp. , 207 S.W.3d 76, 98 (Mo. App. W.D. 2006) (quoting Harris v. Niehaus , 857 S.W.2d 222, 225 (Mo. banc 1993) ) ("The particular standard of care that society recognizes as applicable under a given set of facts is a question of law for the courts. Whether a defendant's conduct falls short of the standard of care is a question of fact for the jury."). This division of labor is particularly appropriate *335 where, as here, the standard of care is provided by a regulation, the interpretation of which is a question of law for the courts. Union Elec. Co. v. Dir. of Revenue , 425 S.W.3d 118, 125 (Mo. banc 2014). BNSF argues that, if the duty set out in § 213.33 is properly interpreted, the Tubbses failed to present evidence of a violation of that duty and the case should not have been submitted to the jury.
Here, the parties agree that § 213.33 provides the relevant standard of care.[11] "Regulations are interpreted according to the same rules as statutes." Dep't of Soc. Servs., Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray Cty. , 224 S.W.3d 1, 9 (Mo. App. W.D. 2007). "In interpreting regulations, the words must be 'given their plain and ordinary meaning.' " Id. (quoting Teague v. Mo. Gaming Comm'n , 127 S.W.3d 679, 686 (Mo. App. W.D. 2003) ). The primary goal in interpreting a regulation is to give effect to the regulatory intent of the promulgating agency as reflected in the plain language of the rule. Stiers , 477 S.W.3d at 615.
Thus, we begin by examining the language of § 213.33, which, in pertinent part, provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed[12] shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned."[13] The parties' dispute about § 213.33 focuses primarily on two phrases-"[e]ach drainage ... facility ... shall be maintained and kept free of obstruction" and "to accommodate expected water flow for the area concerned." The Tubbses interpret these phrases to require BNSF to provide adequate drainage (including additional drainage, if necessary) to accommodate expected water flow, including historic flooding, if that level of flooding is anticipated. In contrast, BNSF interprets the phrase "[e]ach drainage ... facility ... shall be maintained and kept free of obstruction" to require the railroad to only maintain the structural integrity of existing drainage facilities and keep them free of obstruction. The railroad does not read the phrase "to accommodate expected water flow" to broaden that obligation. In other words, BNSF does not believe that § 213.33 requires *336 the railroad to add drainage under any circumstance.[14] But, even if the regulation could be interpreted to require a railroad to expand or add drainage facilities, it is required to do so only to accommodate typical water flow in the area and not water flows at historic levels. We discuss each of these phrases in turn.
Under the plain language of § 213.33, the phrase "maintained and kept free of obstruction" pertains to only "drainage or other water carrying facilit[ies]." In other words, it is "[e]ach drainage or other water carrying facility," and not other parts of the track like the roadbed or the embankment, that must be "maintained and kept free of obstruction." But, as the Tubbses assert, use of the conjunctive "and" indicates that "maintained" and "kept free of obstruction" are two different concepts and, thus, should not be conflated. See City of Olivette v. St. Louis Cty. , 507 S.W.3d 637, 645 (Mo. App. E.D. 2017) (finding that use of the word "and" between "public safety" and "public health" indicated a legislative intent for those "phrases [not] to be synonymous or redundant and [for] each of [those] terms [to] mean something different."). Thus, "maintained" must mean something other than "kept free of obstruction." For example, "maintained" could relate to the structural integrity of an existing drainage facility itself or to its supports, which may have nothing to do with removing obstructions. The question here, however, is whether "maintained" can also mean to expand or add new drainage or water carrying facilities.
The term "maintained" is not defined in the FRSA or its implementing regulations. In the absence of a statutory or regulatory definition, we look to the dictionary to determine the plain and ordinary meaning of a term. Mantia v. Mo. Dep't of Transp. , 529 S.W.3d 804, 809 (Mo. banc 2017). The term "maintain" means "to keep in an existing state (as of repair, efficiency, or validity) ... to preserve from failure or decline...." Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/maintain (last accessed August 13, 2018). Thus, the "plain and ordinary meaning" of "maintained" is to keep something in its existing state through repair or to keep it from failing. Under this definition, the term "maintained" does not appear to include the addition of something new. This view is supported by the structure of § 213.33 as well, which specifies that what is to be maintained is "[e]ach drainage or other water carrying facility," § 213.33 (emphasis added), which suggests that BNSF's obligation to maintain applies solely to drainage facilities already in existence. See Suppes v. Curators of the Univ. of Mo. , 529 S.W.3d 825, 828 (Mo. App. W.D. 2017) (applying the "last antecedent rule" under which "relative or qualitative words *337 are to be applied only to the words and phrases preceding them and not as extending to or including others more remote.").
But we cannot read that phrase in isolation. We also must give meaning to the concluding phrase of § 213.33 -"to accommodate expected water flow for the area concerned." See Buttress v. Taylor , 62 S.W.3d 672, 680 (Mo. App. W.D. 2001) (quoting Habjan v. Earnest , 2 S.W.3d 875, 882 (Mo. App. W.D. 1999) ) ("In interpreting statutes we are required to give meaning to all the terms used."). The phrase "to accommodate expected water flow for the area concerned" describes the reason that each drainage facility must be maintained. In other words, the clause "to accommodate expected water flow for the area concerned" provides a standard of performance for the required task of maintaining each drainage facility. It is difficult to give any meaning to the phrase "to accommodate expected water flow for the area concerned" if the regulation is read to obligate railroads to maintain the structural integrity of only existing drainage facilities and to keep them free of obstruction regardless of the woefully inadequate nature of the existing drainage facilities. In a situation where the number and/or size of drainage facilities is inadequate, no matter how well their structural integrity is maintained or how well they are kept free of obstruction, expected water flow simply cannot be accommodated.
BNSF offers two arguments to support its narrow reading of § 213.33. First, BNSF argues that the "area concerned" is the track and the area adjacent thereto and does not include the Tubbses' property.[15] While this is true, it does not explain how BNSF's narrow reading allows for the accommodation of expected water flow on and under the track or in the area adjacent thereto. Second, BNSF argues that § 213.33 is purely a maintenance regulation and that, in light of ICCTA preemption, it cannot be interpreted to impose any design obligation on the railroad. But a casual reading of Part 213 reveals that, contrary to BNSF's argument, the FRA's safety regulations often impose structural obligations as well as maintenance-related ones.[16] Therefore, we see no basis for BNSF's argument that § 213.33 cannot be read to require additional drainage.
"It is a basic rule of [regulatory] construction that words should be given their plain and ordinary meaning whenever possible and [courts] will look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result defeating the purpose of the [regulation]." State ex rel. Moore v. Brewster , 116 S.W.3d 630, 638 (Mo. App. E.D. 2003).
Here, it is difficult to reconcile the meaning of two critical phrases in § 213.33, and therefore, we look to the purpose of § 213.33 to interpret its meaning. This regulation is promulgated pursuant to the Federal Railroad Safety Act, the purpose of which "is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Therefore, we will consider this broad purpose in determining *338 the specific purpose of the drainage rule in § 213.33.
In MD Mall Associates, LLC v. CSX Transportation, Inc. , 715 F.3d 479, 492 (3d Cir. 2013), a case involving claims for negligence and storm water trespass arising from a spillway that allowed water to drain from the railroad's property onto the Mall's property, the Third Circuit said that § 213.33 is "plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity." Id. The Third Circuit's discussion of § 213.33 's purpose, in combination with the overarching purpose of the FRSA, is instructive. Section 213.33 is intended to ensure railroad safety by preventing water from pooling on or around the tracks. Under BNSF's reading of § 213.33, as long as the structural integrity of existing drainage facilities is maintained and they are kept free of obstruction, the regulation is satisfied, regardless of whether the amount of drainage provided is adequate to accommodate expected water flow. In other words, BNSF reads § 213.33 to protect against only one source of water in the track area-that caused by damage to or blockage of existing drainage facilities, even though the lack of adequate drainage can lead to the same or greater dangers to railroad safety. For example, if read as BNSF suggests, § 213.33 would protect rail safety by preventing the pooling of water or the overtopping of tracks that might occur due to a collapsed or otherwise blocked drainage structure during a heavy rain event, but would do nothing to guard against the exact same risk resulting from inadequate drainage in an area where there is significant runoff during heavy rain. This reading is not consistent with § 213.33 's purpose of accommodating expected water flow so as to ensure railroad safety.
Although MD Mall involved storm water runoff and not widespread flooding conditions, § 213.33 must also be interpreted to prevent the threat to track integrity posed by water pouring over the track or washing away the roadbed's support structure during flooding. In flood conditions, the interpretation of § 213.33 suggested by BNSF-that BNSF is required to maintain existing drainage facilities and keep them free of obstruction, but is not required to provide an adequate amount of drainage-conflicts with the purpose of the drainage regulation. Floodwaters accumulating on one side of a track embankment with inadequate cross-drainage will rise more rapidly and, thus, be more likely to overtop the track, creating a hazard the regulation is intended to prevent. Moreover, uneven water levels between the upstream and downstream sides of such an embankment expose the upstream side to significantly more pressure, thus compromising the embankment's integrity, which is what happened here. Therefore, in the context of a flood, the narrow reading of § 213.33 advanced by BNSF is inconsistent with the regulation's purpose.[17]
*339 Therefore, to give both phrases-"each drainage ... facility ... shall be maintained or kept free of obstruction" and "to accommodate the expected water flow for the area concerned"-meaning consistent with the purpose of § 213.33, we must read the regulation to require not only that existing drainage facilities be kept structurally sound and free of obstruction but also that an adequate amount of drainage be provided.
BNSF also argues that even if § 213.33 imposes upon it a duty to expand or add drainage facilities, that duty applies to accommodate only expected water flow, which does not include flooding of historic proportions such as that experienced near Big Lake in 2011.
As noted above, "[i]t is a basic rule of [regulatory] construction that words should be given their plain and ordinary meaning whenever possible and [courts] will look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result defeating the purpose of the [regulation]." Moore , 116 S.W.3d at 638. Thus, we begin by looking at the plain meaning of the term "expected." "Expected" is not defined in the FRSA or its implementing regulations. As noted above, in the absence of a regulatory or statutory definition, we look to the dictionary to determine the plain and ordinary meaning of a term. Mantia , 529 S.W.3d at 809. The term "expect" means "to look forward"; "to consider probable or certain"; or "to consider reasonable, due, or necessary[.]" Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/expect (last accessed August 13, 2018). Thus, the "plain and ordinary meaning" of the second clause of § 213.33 is that maintenance of each drainage facility includes ensuring that water flow that is "probable or certain" to occur is accommodated.
BNSF argues that "expected water flow" means that which is anticipated based on long-term experience with water flow in the area concerned. While BNSF acknowledges that its embankment and track are located in an area prone to flooding, and thus flooding was expected in the area concerned, it argues that the 2011 flood was different in magnitude or duration from previous floods in the Big Lake area. BNSF contends that § 213.33 did not impose a duty to provide drainage to accommodate the flood of 2011, which was outside of historic norms and, therefore, could not have been expected.
There was evidence of repeated flooding in the Big Lake area starting in the early 1950s. Although there was evidence that a flood in 1952 had a higher peak discharge and higher peak flow than the 2011 flood, there was also evidence that the 2011 flood involved more water and was longer in duration than previous *340 floods. But whether the 2011 flood was so unique vis-à-vis other floods as to make its water flow unexpected was a question for the jury. And, even if the jury concluded that the 2011 flood was greater in magnitude than previous floods, there was still a question of fact as to whether such a flood was probable in light of other evidence, including that, in 2007, the Corps publicly announced that, in the future, it would be releasing a larger volume of water from its reservoirs upstream from Big Lake, which would increase the flow of the Missouri River, creating a greater likelihood of downstream flooding. Thus, there was sufficient evidence to submit to the jury the question of whether BNSF violated its duty to accommodate expected water flow.
The first element of a submissible case of negligence is the existence of a duty on the part of the defendant. Poloski , 68 S.W.3d at 449. The nature and scope of that duty is a question of law for the court. See Thompson , 207 S.W.3d at 98. Here, the trial court determined that the nature and scope of the duty imposed were defined by § 213.33. Because we find that § 213.33, as a matter of law, imposed a duty on BNSF to provide drainage along or under the embankment that bisects the Tubbses' farm to accommodate expected water flow that was probable or certain to occur, the court properly submitted to the jury the question of whether BNSF breached that duty. See Kibbons v. Union Elec. Co. , 823 S.W.2d 485, 489 (Mo. banc 1992) (reversing trial court's judgment finding developer negligent where developer had no legal duty to injured party and question of developer's duty should not have been submitted to the jury). Because we find that the Tubbses made a submissible case on the standard of care owed by BNSF, Point I is denied.
2. The Tubbses presented a submissible case on punitive damages.
A. Standard of Review
"Whether sufficient evidence exists to support an award of punitive damages is a question of law, which [courts] review de novo. " Blanks v. Fluor Corp. , 450 S.W.3d 308, 401 (Mo. App. E.D. 2014). "In reviewing the submissibility of punitive damages, [courts] view the evidence and all reasonable inferences drawn therefrom in the light most favorable to submissibility ... [and] disregard all evidence and inferences that are adverse thereto." Id. "Only evidence that tends to support the submission should be considered." Id.
B. Punitive Damages Standard
"Ordinarily punitive damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." Id. (quoting Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc. , 700 S.W.2d 426, 435 (Mo. banc 1985) ). "But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted." Id. (quoting Hoover's , 700 S.W.2d at 435 ). "In this context, 'reckless' connotes an indifference to whether or not wrong or injury is done." Oyler v. Hy-Vee, Inc. , 539 S.W.3d 742, 746 (Mo. App. W.D. 2017) (quoting Poage v. Crane Co. , 523 S.W.3d 496, 516 (Mo. App. E.D. 2017) ). Alternatively,
there may be conscious negligence tantamount to intentional wrongdoing ... where the person ... act[ing] or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances *341 and existing conditions, that his conduct will naturally or probably result in injury.
Blanks , 450 S.W.3d at 401 (quoting Hoover's , 700 S.W.2d at 435 ).
To begin, the standard for determining whether the plaintiffs made a submissible case for punitive damages applies somewhat differently in the context of the present case where the standard of care is provided by a regulation, the purpose of which is not to prevent the type of injury the plaintiffs claim to have suffered. As we discussed in connection with Point I above, the purpose of § 213.33 is to prevent water from pooling on or under the tracks, overtopping the tracks, or otherwise compromising track integrity, because that may endanger safe railroad operations or cause railroad-related accidents or incidents. But, the Clarification Amendment imposes liability when a railroad's violation of § 213.33 results in property damage even though the regulation itself is not intended to protect neighboring property owners. Typically, punitive damage claims based on an alleged violation of a duty of care established by statute or regulation involve a duty designed to protect the injured party. In such cases, whether punitive damages can be awarded in a negligence action depends on whether the "defendant knew or had reason to know a high degree of probability existed that the action would result in injury." Oyler , 539 S.W.3d at 746 (quoting Poage , 523 S.W.3d at 515 (emphasis in original omitted)). In light of the two-part regulatory scheme at issue in this case, the standard is different. Here the question is whether, through its conduct, BNSF manifested such reckless indifference to the obligations imposed by § 213.33, that the railroad intentionally violated the drainage regulation.
Viewed in the light most favorable to the Tubbses, the evidence in this case was sufficient to permit the jury to conclude that BNSF acted with "conscious negligence tantamount to intentional wrongdoing" where BNSF knew that its track was located in an area that frequently flooded, that the embankment under its track acted as a dam, that the existing drainage facility in the embankment was inadequate to allow water to pass from one side of the embankment to the other, and that the differential in water levels caused by the damming effect of the embankment caused pressure on the embankment. Moreover, although the embankment had survived prior floods, by raising the embankment, BNSF increased the pressure that flooding would cause on the embankment, and BNSF had been put on notice as early as 2007 that, in the future, the Corps would be releasing a larger volume of water from its reservoirs upstream from Big Lake, which would increase the flow of the Missouri River. Thus, there was evidence that BNSF knew that the lack of drainage facilities risked overtopping or compromised structural integrity. Yet BNSF failed to add drainage facilities to accommodate the expected water flow and, as a result, the embankment collapsed.
According to the trial testimony, the area where BNSF's track was located was prone to flooding and BNSF had been put on notice that water flow in the area was likely to increase in the future. BNSF knew its embankment acted like a dam, obstructing the free flow of floodwaters across the valley. Several times over the years, BNSF raised the height of its track to prevent water from spilling over the track and interrupting rail service. But, as the height of the track increased, BNSF did not add drainage to address the increased volume of dammed water. The embankment's damming effect created a situation where the pressure differentials between the upstream (northern) side and *342 the downstream (southern) side could threaten the stability of the embankment. There was testimony that, when the water pressure builds up against the embankment, it causes sediment to be washed away to the point that the embankment collapses, which is exactly what happened at the Tubbses' farm.
In May, BNSF began hiring engineering consultants to advise the railroad about the anticipated flooding that summer. One consultant advised BNSF that drainage through the embankment was so inadequate that four additional drainage openings and a substantial increase in the existing opening were needed to address the anticipated floodwaters. Yet, BNSF added no drainage. Despite having knowledge of the effect of increasing the track height without adding drainage and the likelihood of significant flooding, BNSF focused its actions on raising the track again and fortifying the embankment by adding riprap. In the initial stages of the flood, before the embankment breach at the Tubbses' farm, BNSF contractors were "out there mobilizing to start building bridges." BNSF "knew [they] were going to do something. [They] just didn't know exactly what."[18]
The evidence was sufficient for a reasonable jury to conclude that BNSF was indifferent to the risks associated with the lack of adequate drainage through the embankment.
BNSF argues that there was insufficient evidence to support the jury's award of punitive damages because the Tubbses had to show that the railroad's conduct was "tantamount to intentional wrongdoing," and they failed to do so. Lopez v. Three Rivers Elec. Co-op Inc. , 26 S.W.3d 151, 160 (Mo. banc 2000) (reversing award of punitive damages in a wrongful death case involving a helicopter that crashed after flying into unmarked power lines). In Lopez , the Supreme Court of Missouri articulated three factors weighing against the submission of punitive damages in negligence cases:
prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred.
Id. The first factor-knowledge of prior similar occurrences-does not relieve BNSF of liability here. Although BNSF's embankment had not failed during previous floods, there was evidence that BNSF was aware of the increased damming effect its raised track would have and the likelihood of increased water flow in the area caused by releases from upstream reservoirs. See Koon v. Walden , 539 S.W.3d 752, 773-74 (Mo. App. E.D. 2017) (holding that lack of prior incidents was not important because that factor went to defendant doctor's knowledge, and he admitted knowing the risks of prescribing opioids for plaintiff). With respect to the second factor-the injurious event was unlikely to have occurred absent someone else's negligence-we find that the failure of BNSF's embankment was the result of pressure on *343 the embankment caused by the increased damming effect of the raised embankment and inadequate drainage under or through the embankment, rather than the flood in and of itself. Finally, the third factor-the defendant did not knowingly violate a regulation designed to prevent the type of injury that occurred-also weighs against BNSF. BNSF knowingly took steps that violated the purpose of § 213.33-preventing water from weakening the track support structure. The railroad increased the height of the track knowing that would increase the volume of dammed water and the differential pressure on the embankment, without providing anywhere for the additional dammed water to go, except eventually through a breach in the embankment.[19]
The Eastern District of this court recently elaborated on the meaning of "tantamount to intentional wrongdoing," and we find the analysis in that case persuasive. Koon , 539 S.W.3d at 773-74. In Koon , the court held that there was sufficient evidence for the jury to award punitive damages against a doctor who failed to monitor a patient to whom he had prescribed increasingly high amounts of opioids. Id. The court explained that, "though [the doctor] may have had 'no specific intent to injure,' his awareness-from his knowledge of surrounding circumstances-that his conduct would probably result in injury demonstrates that his actions were 'tantamount to intentional wrongdoing.' " Id. at 773. Likewise, in the present case, the evidence, viewed most favorably to the Tubbses, supports a finding that BNSF was aware-from its knowledge of surrounding circumstances-that its conduct, coupled with the expectation of increased water flow, would probably result in collapse of the track embankment. Under Koon , that is enough to make BNSF's conduct "tantamount to intentional wrongdoing." And, under the Clarification Amendment, the fact that a collapse occurred and the Tubbses' farm was destroyed as a result exposes BNSF to punitive damages.
Accordingly, we conclude that the evidence was sufficient to permit the jury to conclude that BNSF acted with reckless indifference to, or conscious disregard for, its obligations under § 213.33 in circumstances that presented a high probability of harm. Thus, the trial court did not err in submitting the issue of punitive damages to the jury. Point II is denied.
3. The trial court did not err in rejecting BNSF's withdrawal instructions.
A. Standard of Review
"A trial court's refusal of a withdrawal instruction will not be reversed absent an abuse of discretion."
*344 Wilson v. P.B. Patel, M.D., P.C. , 517 S.W.3d 520, 523 (Mo. banc 2017). "A trial court abuses its discretion when a ruling 'is clearly against the logic of the circumstances then brought before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.' " Id. (quoting Dodson v. Ferrara , 491 S.W.3d 542, 552 (Mo. banc 2016) ). "There is no abuse of discretion if reasonable persons could differ about the propriety of the trial court's decision." Stevens v. Craft , 956 S.W.2d 351, 355 (Mo. App. S.D. 1997). "[O]n appeal, discretionary rulings are presumed correct, and the appellant bears the burden of showing an abuse of discretion." Anglim v. Mo. Pac. R.R. Co. , 832 S.W.2d 298, 303 (Mo. banc 1992).
B. Withdrawal Instruction Standard
"Trial courts have the discretion to give withdrawal instructions 'when evidence on an issue has been received, but there is inadequate proof given for final submission of the issue to the jury.' " Wilson , 517 S.W.3d at 523 (quoting Trimble v. Pracna , 167 S.W.3d 706, 716 (Mo. banc 2005) ). However, "[w]ithdrawal instructions should be given when there is evidence [that] might mislead the jury in its consideration of the case as pleaded and submitted." Arnold v. Ingersoll-Rand Co. , 908 S.W.2d 757, 764 (Mo. App. E.D. 1995). Additionally, "where the evidence is of a character that might easily lead to the raising of a false issue, the court ought to guard against such an issue by appropriate instructions." Wilson , 517 S.W.3d at 524 (quoting Sampson v. Mo. Pac. R.R. Co. , 560 S.W.2d 573, 584 (Mo. banc 1978) ). Withdrawal instructions may also be appropriate "when there is evidence presented directed to an issue that is abandoned ... or ... [when] clarifying damages for the jury." Stevens , 956 S.W.2d at 355 (citing MAI 34.01, General Comment).
C. Withdrawal Instructions on Height and Design of Track
At trial, BNSF raised an objection to the Tubbses' arguments about the height of the track, arguing that the issue was preempted. The trial court overruled the objection but gave BNSF a standing objection to any inquiry about the track's height. Then, during the instruction conference, BNSF proposed the following withdrawal instructions about the height and design of the track structure:
Instruction No. C-The evidence of the height of Defendant's track or increases in height of Defendant's track is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
Instruction No. E-The design of Defendant's track structure is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
The court rejected these instructions. When the Tubbses' counsel raised arguments about the height of the track during his closing argument, BNSF renewed its objection on preemption grounds. This time, the trial court sustained BNSF's objection and told the Tubbses' counsel in a sidebar discussion: "And to correct this ..., I'm going to instruct you to explain [to the jury] that the pertinent issue is the drainage of the water." Counsel then turned to the jury and stated: "So I want to make sure that the complaint is not that they raised the track by 2 foot; that's not the issue. It's raising the track with no drainage; [they] didn't add one more foot of opening."
The verdict-directing instruction provided to the jury stated,
Your verdict must be for plaintiffs, if you believe:
*345 First, defendants failed to maintain and keep free of obstruction each drainage or other water carrying facility under or immediately adjacent to the roadbed to accommodate expected water flow for the area concerned, and
Second, defendant was thereby negligent, and
Third, as a direct result of such negligence plaintiffs sustained damage.
None of the instructions given to the jury mentioned the height or design of the track.
We find that the trial court did not abuse its discretion in denying BNSF's Instruction No. C (height of BNSF's track) or Instruction No. E (design of BNSF's track structure). The Tubbses' claim of inadequate drainage is inextricably linked to increases in the height of the track. Proposed instructions C and E would have withdrawn evidence of the height and design of the track, but the height and design of the track were relevant to the Tubbses' claim that more drainage was needed to comply with § 213.33. The taller the track, the greater the damming effect of the embankment and, therefore, the greater the need for drainage. It would have been unreasonable to ask the jury to consider the Tubbses' claim without regard to any evidence of the increasing height of the track. And our review of the trial testimony revealed that, for the most part, when evidence about track height was presented, it was in conjunction with the lack of additional drainage.
Even if we were to determine from our review of the testimony that the jury could have been misled into thinking that the proper height and design of the track were issues for deliberation, counsel's statement about the pertinent issue being drainage, when coupled with the verdict-directing instruction, were sufficient to ensure that the jury would not be misled. Both counsel's statement and the verdict-directing instruction, which tracked the language of § 213.33, made clear to the jury that the issue for deliberation was drainage and not track height or design. Thus, the trial court properly exercised its discretion in rejecting BNSF's withdrawal instructions on track height and design. Point III is denied.
D. Withdrawal Instruction on Intentional Breach Theory
At trial, the Tubbses introduced an internal BNSF email indicating that the railroad had intentionally breached the embankment where the track ran along another farm to relieve pressure created by the floodwaters. However, all of the witnesses who testified on this issue, including the author of the email, stated that the intentional breach never occurred, and the Tubbses offered no other evidence to the contrary.
During the instruction conference, BNSF proposed the following withdrawal instruction:
Instruction No. A-Any evidence concerning intentional breach of the roadbed is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.
The trial court rejected this instruction, but directed plaintiffs' counsel "to not argue intentional breach" in his closing statement. None of the instructions provided to the jury addressed the issue of intentional breach.
Although it would have been prudent for the trial court to give BNSF's withdrawal instruction on intentional breach, the court's decision to reject the instruction is not an abuse of discretion. "There is no abuse of discretion if reasonable persons could differ about the propriety *346 of the trial court's decision." Stevens , 956 S.W.2d at 355. Here, reasonable people could disagree about the propriety of the court's decision to deny the instruction on intentional breach.
Although the BNSF email about an intentional breach was admitted into evidence, every witness, including the Tubbses' expert, testified that no intentional breach occurred. The instructions given to the jury were consistent with the evidence. None of the instructions, including the verdict director, mentioned an intentional breach. And the Tubbses' counsel did not mention the intentional breach email in his closing argument. See Burton v. Phillips , 7 S.W.2d 712, 715 (Mo. App. 1928) (finding no prejudice where trial court refused withdrawal instruction on an issue not submitted to the jury). As a result, there was little or no risk that the jury was misled by the evidence of an intentional breach of the embankment. Under these circumstances, we defer to the trial court's assessment of whether the proposed withdrawal instruction was necessary to avoid confusion on the part of the jury. Point IV is denied.
Conclusion
Finding that the Tubbses made a submissible case on the standard of care under 49 C.F.R. § 213.33 and punitive damages, and finding that the trial court did not err in denying BNSF's withdrawal instructions pertaining to the height and design of the track and intentional breach, we affirm.
Lisa White Hardwick and Edward R. Ardini, Jr., Judges, concur.

Thomas Tubbs sued individually and as Trustee of the Thomas Tubbs Revocable Trust, and Dana Tubbs sued individually and as Trustee of the Dana Lynn Tubbs Revocable Trust. For ease of reference, we refer to the Respondents collectively as "the Tubbses."

When reviewing the denial of a motion for judgment notwithstanding the verdict, we view the evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict. Fleshner v. Pepose Vision Inst., P.C. , 304 S.W.3d 81, 95 (Mo. banc 2010).

The Tubbses voluntarily dismissed Massman Construction from the lawsuit shortly before trial.

All statutory references are to the United States Code (2012).

All regulatory references are to the Code of Federal Regulations (2018).

The Tubbses incorporated by reference their prior state-law claims in their Second Amended Petition to avoid any argument of waiver but they did so with the understanding that those claims had been dismissed.

BNSF raised an objection to the Tubbses' arguments about "the height" of the track, arguing that the "height of the track is a preempted issue." In response, the Tubbses argued that their claim was not that the height of the track constituted a design defect but rather that, pursuant to § 213.33, BNSF provided inadequate drainage under the roadbed and that the height of the track was relevant to the issue of adequate drainage. The trial court overruled the objection but gave BNSF a standing objection to all inquiries related to the height of the track.

On June 2, 2011, the Village of Big Lake filed for injunctive relief under state law alleging that BNSF had raised the track over the last fifteen years without suitable openings and without the Village's preapproval, which was required by ordinance. The trial court dismissed the Village's claims on federal preemption grounds, and this court affirmed. See Vill. of Big Lake v. BNSF Ry. Co. , 382 S.W.3d 125, 126-30 (Mo. App. W.D. 2012).

The Tubbses amended their Petition to include a claim based on 49 C.F.R. § 213.33after the Surface Transportation Board (STB) and Eighth Circuit decisions; at the time of those decisions, the only claims the Tubbses had formally asserted against BNSF were their state-law claims.

As noted above, the STB determined that the Tubbses' state-law claims were preempted under the Interstate Commerce Commission Termination Act (ICCTA), and the Eighth Circuit denied their petition for review of the STB's decision. There are actually two federal preemption statutes that are potentially relevant here-the ICCTA and the Federal Railroad Safety Act (FRSA). Generally, the ICCTA provides the appropriate basis for analyzing whether a state law affecting rail transportation, including construction of tracks, is preempted by federal law. The FRSA provides the appropriate basis for analyzing whether a state law affecting rail safety is preempted. The ICCTA has a broader preemptive effect than the FRSA. Because the STB and the Eighth Circuit applied ICCTA preemption to the Tubbses' state-law claims and we are bound by their decisions, we do not address FRSA preemption here.

As the Tubbses point out, their negligence claim is authorized by 49 U.S.C. § 20106, referred to as the "Clarification Amendment," which provides, in pertinent part, that "[n]othing in this section shall be construed to preempt an action under State law seeking damages for ... property damage alleging that a party ... [h]as failed to comply with the Federal standard of care established by a regulation ... issued by the Secretary of Transportation (with respect to railroad safety matters)...."

" 'Roadbed' is not defined in the regulations but the term commonly refers to the area under and adjacent to the tracks." Anderson v. Wis. Cent. Transp. Co. , 327 F.Supp.2d 969, 979 n.11 (E.D. Wis. 2004).

Section 213.33 is part of Subpart B (Roadbed) of the FRSA regulations. Subpart B "prescribes minimum requirements for [the] roadbed and areas immediately adjacent to [the] roadbed." 49 C.F.R. § 213.31. Thus, § 213.33 establishes the standard of care for the roadbed and areas immediately adjacent thereto, and, if a railroad fails to meet that standard of care and other property is damaged as a result, the Clarification Amendment gives property owners a cause of action for damages. See Jeffers v. BNSF Ry. Co. , No. 14-CV-188, 2015 WL 852591, *4 (W.D. La. Feb. 26, 2015) (finding genuine issue of fact as to whether BNSF's blocked culvert caused flood damage to neighboring property); Chambers v. Ill. Cent. R.R. Co. , No. W2013-02671-COA-R3-CV, 2015 WL 2105537, *7 (Tenn. Ct. App. May 5, 2015) (finding genuine issue of fact as to whether railroad complied with § 213.33 in suit claiming blocked culvert caused flood damage to neighboring property).

In its opening brief, BNSF rejects the Tubbses' argument that a requirement to provide additional drainage is implied in § 213.33 by noting that the Federal Railroad Administration (FRA) cannot regulate through implication. In support of its argument, BNSF cites FCC v. Fox Television Stations, Inc. , 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012) for the proposition that regulations must be explicit so that the regulated entity has fair notice of conduct that is forbidden and required. There, the Supreme Court stated, "[t]h[e] requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." Id. To the extent BNSF raises a due process challenge to the trial court's interpretation of § 213.33, that challenge is not properly before us because it was raised for the first time in BNSF's opening brief. See In re Care and Treatment of Kirk , 520 S.W.3d 443, 457 (Mo. banc 2017) (requiring that, to preserve a constitutional issue for appellate review, the issue be raised at the earliest opportunity and be kept alive during the proceedings).

While "area concerned" is not defined in the regulations, "it is clear that the 'area concerned,' specifically for safety purposes, is the railroad track and the track's roadbed." Miller v. Southeastern Pa. Transp. Auth. , 628 Pa. 78, 103 A.3d 1225, 1238 (2014).

For example, 49 C.F.R. Part 213, Subpart C (Track Geometry) prescribes requirements for the gage, alignment, and surface of track, and the elevation of outer rails, among other things. 49 C.F.R. § 213.51. And, 49 C.F.R. Part 213, Subpart D (Track Structure) prescribes minimum requirements for ballast, crossties, track assembly fittings, and the physical conditions of the rails. 49 C.F.R. § 213.101.

In interpreting the meaning of § 213.33, BNSF asks us to consider an FRA opinion letter. On November 28, 2017, the FRA issued an opinion letter to BNSF concluding that 49 C.F.R. § 213.33 does not require the addition of more drainage openings. The next day, BNSF submitted the letter to this court and opposing counsel as supplemental authority pursuant to Western District Local Rule XXXVII(B). The Tubbses moved to strike the FRA letter, BNSF filed suggestions in opposition, and we took the Tubbses' motion with the case. Local Rule XXXVII(B) permits counsel to "call the court's attention to intervening decisions or new developments by directing a short letter providing the supplemental citations to the clerk...." In State ex rel. Presbyterian Church of Washington, Mo. v. City of Washington , 911 S.W.2d 697, 699 n.3 (Mo. App. E.D. 1995), the Eastern District of this court interpreted its version of Local Rule XXXVII(B) (Eastern District Local Rule 370(b)), which mirrors our Local Rule XXXVII(b) in all key respects, to pertain to citable authority. The Eastern District noted that the rule's reference to "citations" made clear "this rule envisions late-breaking court decisions or changes by the legislature that may affect a pending appeal." Id. BNSF made no representation that the FRA opinion letter was published or otherwise citable, and we have found nothing indicating that the letter was published. Because the FRA letter is not the type of supplemental authority envisioned by Local Rule XXXVII(B), we decline to consider the letter and, therefore, we deny the Tubbses' Motion to Strike the letter as moot. See ADP Dealer Servs. Grp. v. Carroll Motor Co. , 195 S.W.3d 1, 5 n.3 (Mo. App. E.D. 2005) (denying plaintiffs' motion to strike defendant's brief and supplemental legal file as moot where the court did not rely on documents in the supplemental legal file in reaching its decision).

BNSF argues that it would be unreasonable to expect it to make changes to the structure of its embankment in the spring of 2011 based on information it learned that spring. As set out, supra , in concluding that there was sufficient evidence from which the jury could have found that BNSF violated its obligations under § 213.33, we do not rely on evidence of conditions unique to the spring of 2011. And, to the extent that we rely on actions BNSF considered taking at that time, we do so because they reflect the magnitude of the problem that existed related to BNSF's embankment and the fact that the railroad chose to make other structural changes to the track rather than adding drainage.

BNSF also cites Alcorn v. Union Pacific Railroad Company , 50 S.W.3d 226 (Mo. banc 2001), overruled on other grounds by Badahman v. Catering St. Louis , 395 S.W.3d 29 (Mo. banc 2013), in support of its argument that there was insufficient evidence to support the jury's award of punitive damages. The plaintiff in Alcorn suffered serious and permanent injuries as a result of a collision with a train at a grade crossing that was obstructed from view. Id. at 232-34. Despite the fact that there had been a fatal accident at the same crossing just four months earlier and several near misses, the Missouri Supreme Court reversed the award of punitive damages because the railroad had cooperated with the federal regulatory process. Id. at 233, 249. The Court concluded that "conformity with the regulatory process does negate the conclusion that the railroad's conduct was tantamount to intentional wrongdoing." Id. at 249. Alcorn is distinguishable from the present case because, in addition to having knowledge of the danger posed to the embankment and track structure, BNSF did not conform with the regulatory process because the railroad failed to provide adequate drainage.